CITY OF WATERVILLE

*vs.*

KENNEBEC WATER DISTRICT, INHABITANTS OF THE TOWN OF FAIRFIELD AND FAIRFIELD VILLAGE CORPORATION.

Kennebec.   Opinion, March 13, 1942.

*Pattangall, Goodspeed & Williamson,* Augusta,

*James L. Boyle,* Waterville,

*Edmund M. Sweeney,* Waterville, for the plaintiff.

*Skelton & Mahon, Lewiston,* for defendants.

SITTING: BARNES, C. J., STURGIS, THAXTER, HUDSON, MANSER.
BARNES, C. J., sat at the argument but did not participate in the opinion.

STURGIS, J. The Territory and the people constituting the City of Waterville and the Fairfield Village Corporation, both in the State of Maine, by the provisions of Chapter 200 Private and Special Laws 1899 were constituted a quasi municipal corporation under the name of the Kennebec Water District for the purpose of supplying the inhabitants of the District and of the towns of Benton and Winslow and the municipalities with pure water for domestic and municipal purposes, with authority to acquire the entire plant, property and franchises, rights and privileges of the Maine Water Company, an existing local public service corporation, to take and hold the water of designated rivers and streams and their tributary lakes and any land and real estate necessary for purposes there enumerated and to lay and take up, repair and replace all necessary pipes, aqueducts and fixtures in and through the streets and highways of the District and of the towns of Benton and Winslow. The management of the District was vested in a Board of Trustees who were authorized to issue bonds to pay for the property of the Maine Water Company and a new source of water supply including the incidental expenses thereof, but for no other purpose.

After delays, the reasons for which are not here of concern, as of April 30, 1905, the end of its first active fiscal year, the Kennebec Water District had completed its purchase of the property of the Maine Water Company, acquired a new source of water supply and made extensive additions and improvements which it carried on its books as betterments, for all of which it was indebted on outstanding notes and open accounts. It had not at this time issued any bonds.

In Chapter 152 of the Private and Special Laws of 1905, the power of the Kennebec Water District to issue bonds under its Charter was broadened and it was granted the right to refund

its indebtedness and make temporary loans. The Amendment in part reads:

"Section 3. * * *

    Section 10. The trustees of the district may for the purpose of paying any necessary expenses and liabilities incurred under the provisions of this act including the expenses incurred in acquiring the property of the Maine Water Company by purchase or otherwise, in securing sources of supply, taking water and land, paying damages, laying pipes, constructing, maintaining and operating a water plant, and making renewals, extensions, additions and improvements to the same, issue from time to time bonds of the district to an amount necessary in the judgment of the trustees therefor. * * *

Section 4. Said district is hereby authorized to refund its indebtedness from time to time in whole or in part as may seem best to the trustees and to borrow money temporarily for any of the legitimate purposes of the district."

Acting under this amendment, during the fiscal year ending April 30, 1906, the floating debt of the District was refunded by a bond issue of $950,000 and with assets of a book value of $968,060.10, its balance sheet showed a small book surplus. This, in general, was the financial structure of the Kennebec Water District at the beginning of its public service.

It is not necessary to follow and review in detail the subsequent growth and progress of the District. It has been developed into a water system of large proportions completely modern and in first class condition. Its service has been improved and extended and is of a high order. As of December 31, 1936, the end of its then current fiscal year, its balance sheet showed that its total assets had increased to $1,763,-281.41. Its bonded indebtedness had been reduced to $850,-000.00. Among its liabilities are listed Long Term Debt Retired Through Surplus $336,000, Sinking Fund Reserves

$176,988.24. Other Permanent Reserves $10,000 and Reserve for Depreciation $189,861.24. A Surplus (Profit and Loss) of $189,522.39 is reported. This was the financial status of the District according to its current balance sheet when this proceeding was instituted.

The income of the Kennebec Water District, in the main, comes from water rates paid by private and public consumers. These rates by the terms of its Charter were to be established and disbursed by the Board of Trustees in accordance with the following formula:

"Section 11. All individuals, firms and corporations, whether private, public or municipal, shall pay to the treasurer of said district the rates established by said board of trustees for all water used by them, and said rates shall be uniform in their application within the district. Said rates shall be so established as to provide revenue for the following purposes:

I. To pay the current running expenses for maintaining the water system and provide for such extensions and renewals as may become necessary.

II. To provide for payment of interest on the indebtedness of the district.

III. To provide each year a sum equal to not less than one, nor more than three per cent of the entire indebtedness of the district, which sum shall be turned into a sinking fund to provide for the final extinguishment of the funded debt. The money set aside for the sinking fund shall be devoted to retirement of the district's obligations or invested in such securities as savings banks are allowed to hold.

IV. If any surplus remain at the end of the year it shall be divided between the municipalities composing the district in the same proportions as each contributed to the gross earnings of the district's water system, and in order that these proportions may be readily determined, all

money received for water in each of said municipalities shall be entered in separate accounts so that the total amount thereof can be easily ascertained."

No question as to the fairness of the rates established under this provision is raised here. Complaint is that Clause IV of Section 11 has never been complied with and surpluses remaining at the end of many years have never been divided.

In this proceeding in Equity the City of Waterville seeks an accounting by the Kennebec Water District and prays that it be declared a trustee, for the complainant and all others entitled thereto, of the funds representing the surplus of its rate revenues remaining at the end of each year of its operations and of all moneys diverted without authority from its surpluses. The Kennebec Water District in its Answer, denying generally the allegations of the Bill, pleads the statute of limitations and submits an account of its annual receipts and disbursements, which, as made up, shows no substantial annual surpluses ever existed or accumulated. To this Replication was filed. The Inhabitants of the Town of Fairfield and the Fairfield Village Corporation, joined as defendants, having failed to appear, decrees pro confesso have been entered against them.

The City of Waterville introduces the yearly balance sheets of the Kennebec Water District, supplemented by accountants' schedules and computations based on an examination of the corporate books and records, which purport to exhibit, in accordance with accepted accounting rules and practices, the accrual of annual surpluses of rate revenues during the years 1912-1936 inclusive, amounting in the aggregate to $289,-843.09 which are distributable among the municipalities composing the district under Paragraph IV Section 11 of the Act of Incorporation. Arrayed against this audit are computations compiled by the Kennebec Water District, which based on different accounting methods, if found tenable, refute the contentions of the City of Waterville and the conclusions of its

accountants, that any substantial annual rate revenue surpluses ever came into existence, accumulated or are distributable.

The disparity in the accountings of the parties, in the main, grows out of conflicting contentions as to whether the Kennebec Water District in determining its distributable surpluses has had authority to (1) deduct annual depreciation charges from its current revenues from water rates and if so in what amount; (2) deduct from this income capital expenditures for Improvements and Additions to the plant; (3) deduct maximum authorized annual sinking fund appropriations regardless of actual amounts set aside and credited, and cumulate the same; (4) cumulate any and all allowable deductions not taken, against subsequent surpluses. These and incidental questions of lesser magnitude are all controlled by the applicable provisions of the Charter, original and amended. The powers there specifically enumerated and expressly granted to the Water District and such incidental implied powers as are necessary to carry out its express powers and the object of its incorporation, all subject to conditions and regulations imposed by the Charter, are the measure of its authority. *Gardiner Trust Co.* v. *Augusta Trust Co.*, 134 Me., 191, 182 A., 685; *Hyams* v. *Old Dominion Co.*, 113 Me., 294, 93 A., 747; *Franklin Co.* v. *Lewiston Inst. for Savings*, 68 Me., 43; *Brown* v. *Little*, 269 Mass., 102; *Davis* v. *Old Colony R. Co.*, 131 Mass., 258; 2 *Pond, Public Utilities Fourth Ed.*, 898; 13 *Am. Jur.* 770.

In the Charter, the Legislature, as already seen, itself established the water rates to be charged by this Utility and expressly limited the amount thereof to enough to provide for (1) the payment of the current running expenses for maintaining the water system and of necessary extensions and renewals, (2) the payment of interest on indebtedness and (3) each year a sum equal to not less than one nor more than three per cent of the entire indebtedness to be turned into a sinking fund to provide for the final extinguishment of the funded debt. Supplementing these limitations provision is made for divid-

ing any surplus of revenues between the municipalities of the district. This charter regulation of rates and express limitations upon their uses is the prototype and in harmony with the policy of the Legislature of this State in granting charters for municipal water districts. In five sessions, 1905-13, eighteen charters were granted and in all, excluding the provision for payments for extensions and renewals out of income, the limitations upon the purposes for which rates could be charged were similar and uniformity in this respect has since continued. *Knowlton* v. *Farmington Village Corporation*, P. U. R. 1918 E 884.

The provision here that extensions and renewals may be paid for out of income is practically sui generis. The same provision appears in the Charter of the Augusta Water District, Private and Special Laws 1903 Chapter 334. But in later water district charters it is eliminated. See Charter of Portland Water District, Private and Special Laws 1907 Chapter 433. In the later charters the propriety of treating such expenditures as proper charges to rate revenues seems to have been questioned and financing them as capital charges through bond issues is approved and generally made mandatory.This change of Legislative policy was incorporated into the Charter of this Water District at the very beginning of its active operations by the Amendment appearing in the Private and Special Laws 1905 Chapter 152 Section 3 which, as already recited, permitted the issuance of bonds for "making renewals, extensions, additions and improvements," a power thereafter to be exercised as if contained in the original Act. *State* v. *Leo*, 128 Me., 441, 148 A., 563; *Commonwealth* v. *Howes*, 270 Mass., 69; *United States* v. *LaFranca*, 282 U. S., 568, 51 S. Ct., 278; *Endlich Int. Stat.*, ‡294. A power permissive, however, as to "renewals and extensions" and in no way abrogating the right of the corporation to make such expenditures out of income, but mandatory as to "additions and improvements" for which no other provision for payment is made.

## DEPRECIATION.

What, then, is the power of the Utility and its Trustee, in respect to making annual charges against its current earnings from water rates for "Depreciation"? While the deduction is not in terms authorized by the Charter, it must be deemed to be included by implication in the powers granted. The first purpose for which revenues from water rates can be used as there stated in Paragraph I Section 11 is of this tenor:

> "to pay the current running expenses for maintaining the water system and provide for such extensions and renewals as may become necessary."

The expression "current running expenses," we think, is intended to include any and all ordinary and proper expenditures in any year. "Maintaining" is a word of broad signification and when applied to the subject matter to which it here relates, and with no other provision therefor appearing, must be held to include not only the annual "upkeep" or "current maintenance" but also the "operation" of the system. *Roberts v. City of Los Angeles,* 7 Cal. (2), 477, 488, 61 P (2), 323; *Peo. v. Clark,* 296 Ill., 46, 53; *Peo. v. A. T. & S. F. Ry. Co.,* 300 Ill., 415, 417, 133 N. E., 250; *Boston Petitioners,* 221 Mass., 468, 475; *Saltonstal v. Railroad,* 237 Mass., 391, 397; *Insurance Co. v. Wayne,* 75 Ohio St., 451, 472; 26 *Words and Phrases, Perm. Ed.,* 80. We have no doubt that by this provision the Legislature intended to make current maintenance and any other proper operating expenses primary charges upon rate revenues with special authority for including the cost of necessary "extensions and renewals" in the charge.

It is well settled that it is not only proper for the officers of a public service corporation but it is their duty to make a yearly allowance of a certain sum or a per cent of the value of the fixed assets, other than land, for depreciation as an operating expense to be deducted from the gross income. An instructive discussion of this accounting principle appears in 19 *Fletcher Encyclopedia Corporation Perm. Ed.* Sec. 9259, where we read:

"Theoretically, the values of the fixed assets of a corporation are constantly depreciating, through age, use and obsolescence and there will be a time when they must all be replaced and only the real estate will have a substantial value. There is a school of thought that contends that, in a large group of properties, where repairs and replacements are constantly being made, the value of the property is constantly being kept up to at least the original book figures of value and that, when you also take into consideration the element of appreciation in the value of certain of the items, there is no necessity for any annual charge for depreciation. * * * It is the general consensus of accounting opinion, however, that an annual charge should be made on the books of every corporation to cover the depreciation of fixed assets, and every soundly managed corporation will be found to pursue that practice. As to the amount to be charged for depreciation, accountants will differ. Theoretically, the annual charge should be such an amount as will be sufficient to replace the asset when it has passed its life of usefulness. * * *

The depreciation charge is generally shown on the assets side of the ledger under the fixed assets account, the undepreciated value of the assets being shown, then the deduction for depreciation and the remainder, after the deduction for depreciation, being set forth as the asset value of the property. * * * Some accountants, however, follow the method of showing the depreciation account on the liabilities side of the balance sheet as a depreciation reserve. In such case the fixed assets will appear on the assets side of the sheet at their undepreciated value and the depreciation items will appear on the liabilities side under the heading 'Reserve for Depreciation'."

In *Knoxville* v. *Knoxville Water Co.,* 212 U. S., 1, 29 S. Ct., 148, that Court said:

"A water plant, with all its additions, begins to de-

preciate in value from the moment of its use. Before coming to the question of profit at all the company is entitled to earn a sufficient sum annually to provide not only for current repairs, but for making good the depreciation and replacing the parts of the property when they come to the end of their life. The company is not bound to see its property gradually waste, without making provision out of earnings for its replacement. It is entitled to see that from earnings the value of the property invested is kept unimpaired, so that, at the end of any given term of years, the original investment remains as it was at the beginning. It is not only the right of the company to make such a provision, but it is its duty to its bond and stockholders, and, in the case of a public service corporation, at least, its plain duty to the public. If a different course were pursued the only method of providing for the replacement of property which has ceased to be useful would be the investment of new capital and the issue of new bonds or stocks. This course would lead to a constantly increasing variance between present value and bond and stock capitalization,—a tendency which would inevitably lead to disaster either to the stockholders or to the public, or both."

In *Lindheimer et als.* v. *Illinois Tel. Co.*, 292 U .S., 151, 54 S. Ct., 658, Chief Justice Hughes, in delivering the opinion, said:

"Broadly speaking, depreciation is the loss, not restored by current maintenance, which is due to all the factors causing the ultimate retirement of the property. These factors embrace wear and tear, decay, inadequacy, and obsolescence. Annual depreciation is the loss which takes place in a year. In determining reasonable rates for supplying public service, it is proper to include in the operating expenses, that is, in the cost of producing the service, an allowance for consumption of capital in order

to maintain the integrity of the investment in the service rendered. The amount necessary to be provided annually for this purpose is the subject of estimate and computation. * * * In the process of current maintenance 'new parts' are 'installed to replace old parts' in units of property not retired. Such 'substitutions or repairs' are separate from the amounts which figure in the depreciation reserve. The distinction between expenses for current maintenance and depreciation is theoretically clear. Depreciation is defined as the expense occasioned by the using up of the physical property employed as fixed capital; current maintenance, as the expense occasioned in keeping the physical property in the condition required for continued use during its service life. But it is evident that the distinction is a difficult one to observe in practice with scientific precision, and the outlays for maintenance charged to current expenses may involve many substitutions of new for old parts which tend to keep down the accrued depreciation."

We have not overlooked the argument that while it is conceded that an annual allowance for depreciation may be made and charged to operating expense by a public service corporation under present-day accounting rules, that principle had not been judicially recognized when the Charter of the Kennebec Water District went into effect. It is common knowledge, however, and verified in the record, that long prior to 1899 when the Charter was enacted the practice had been generally approved and adopted by accountants. In *San Diego Land & Town Co.* v. *National City*, 174 U. S., 739, 19 S. Ct., 804, the question had then already been raised and in an opinion handed down on May 22, 1899, the propriety of an annual depreciation charge by a water company serving the public was judicially recognized. This case and the conclusion there reached upon this question is quoted with approval in *Kennebec Water District* v. *Waterville*, 97 Me., 185, 54 A., 6, which

bears date of December 27, 1902. If we assume, which we cannot, that the Legislature, when it granted this Charter, did not know of this practice, it must be inferred that when it provided that the current running expenses of maintaining, that is keeping up and operating the water system, should be paid from water revenues, they intended, that any and all proper items of operating expense should be paid from that source. To include depreciation in operating expenses is but to extend the applicable charter provision to that which is but a species of its genus. *Hurley* v. *Thomaston,* 105 Me., 301; *Endlich Int. of Statutes* Sec. 112; 59 *Corpus Juris,* 973.

The amount of the annual allowance for depreciation is the "subject of estimate and computation." Theoretically the annual charge should be "sufficient to replace the asset when it has passed its life of usefulness." In practice this theory should be regarded in so far as the finances of the utility permit. There seems to be no hard and fast rule, however, as to the method by which annual depreciation should be computed. Several methods are used. A rough estimate, an exact estimate based on frequent examinations of the plant and a determination of its "condition per cent," an arbitrary annual allowance, an annual sum determined by the "sinking-fund" method, so called, which placed at compound interest at some selected rate, usually 4%, will amount to the original cost of the depreciated items at the end of their lives, or through the "straight-line" method by dividing the costs of the items, less salvage, by the estimated years of their useful lives and charging the result currently as annual depreciation. By any of these methods in modern practice the depreciation charges are usually credited to a "Reserve for Depreciation" to appear on the liabilities side of the balance sheet. It is common knowledge that this form of accounting is currently required by the Interstate Commerce Commission, the United States Treasury Department and by the Public Utilities Commission of this State. Accounting for annual depreciation through the fixed assets account and a Surplus is not generally approved.

But the important question here is not by what method annual depreciation has been computed by the Kennebec Water District but whether the allowances which have been made were reasonable in amount, having regard for the cost of current maintenance. "Depreciation is the loss, not restored by current maintenance * * *. * * * and the outlays for maintenance charged to current expenses may involve many substitutions of new for old parts which tend to keep down the accrued depreciation." *Lindheimer et als.* v. *Illinois Tel. Co.*, supra, "Since depreciation is the loss, not restored by current maintenance it is axiomatic that high maintenance cost means low depreciation and vice versa." *Gas Co.* v. *Texarkana,* 17 Fed. Supp., 447, 462. As to outlays for current maintenance including Extensions and Renewals, the Report indicates that they have been substantial but, in so far as is made to appear, not excessive. The fixed assets have been kept and are today apparently in excellent condition. This indicates sound and prudent management. It does not indicate that reasonable annual depreciation charges to meet the loss resulting from "wear and tear, decay, inadequacy and obsolescence" which has not been restored by current maintenance should not be made. The Kennebec Water District is a public utility and subject in the matter of its accounting to the jurisdiction, control and regulation of the Public Utilities Commission. R. S. c. 62 #15 et seq; *Eaton* v. *Thayer*, 124 Me., 311. Since 1915, with the approval of the Commission, the District has annually charged $15,000 to operating expense for depreciation and credited the same to a Reserve for Depreciation. Before that time, in years with which we must be concerned, comparable annual depreciation charges were made and accounted for through Surplus. The difference in accounting methods is not important. The approval of annual depreciation charges by the Public Utilities Commission cannot be disregarded and prior charges can properly be examined as to their reasonableness in the light which that approval reflects. Notwithstanding assertions to the contrary, we find no sound basis in this Report for reducing the

annual depreciation charges which have been made by the Kennebec Water District.

## ADDITIONS AND IMPROVEMENTS.

In the original Charter of the Kennebec Water District there was no express provision for payment of the cost of necessary "additions and improvements." In the amendment, P. & S. L. 1905 c. 152 ‡3 payment therefor through bonds was authorized but the cost of those items has never been made a charge upon income. They are capital items and should be charged as such. Additions to the plant to meet increased demands for water and the replacement of inadequate or worn out parts of the plant with something larger, more valuable or better suited to present needs or more economical to operate effecting new additions or alterations to the condition of the plant which are not mere acts of restoration involved in renewals or repairs come within the meaning of ADDITIONS AND IMPROVEMENTS. In so far as the additions and substitutions are only renewals and repairs, the cost thereof is chargeable to earnings. Costs in excess thereof should be charged to capital. This is the uncontradicted result of the definitions and explanations of the terms by the eminent engineer and accountants who were heard in this case. We find no support for the contention advanced that capital expenditures for Additions and Improvements to the plant should be deducted from rate revenues by the Kennebec Water District in determining its distributable annual surpluses.

## SINKING FUND.

In Paragraph III of Section 11 of its Charter, the Kennebec Water District is required through its Board of Trustees to establish rates for water service sufficient to provide each year a sum equal to not less than one nor more than three per cent of the entire indebtedness of the District to be turned into a sinking fund to provide for the final extinguishment of the funded debt. This obligation is, of course, subject to the

priority charges against rates for current running expenses, extensions and renewals, and interest on indebtedness appearing in Paragraphs I and II of the Section and is conditional upon there being sufficient rate revenue remaining after the payment of the prior charges to meet the sinking fund requirement. If in any year there is no available income from rates for the purpose, no sum can be set apart for the sinking fund and although its impairment by such a default may be repaired by increased payments in succeeding years not exceeding the maximum allowed by the Charter and out of available rate revenues of the years then current, no deficiency in the sinking fund payment of a year can be made a direct charge upon rate revenues of any other year. *Opinions of Justices,* 5 Metc. (Mass.), 596, 600; 19 *Corpus Juris Secundum,* 784. However, when there are rate revenues available, payments to the sinking fund should be made, at least to the amount of the minimum requirement of the Charter and income available for that purpose cannot be lawfully diverted to other uses. A Sinking Fund is a trust fund and bondholders are entitled to have its integrity maintained and to compel the restoration of moneys unlawfully diverted from it to other uses. *Equitable Trust Co.* v. *Green Star S. S. Corporation,* 291 F., 650; *Brown* v. *Penna. Canal Co.,* 244 F., 980; *Truby* v. *M . & T . Trust Co.,* 253 N. Y. S., 108. We do not think it an undue strain upon equity to here consider water revenues actually in the possession of the Kennebec Water District and available after the payment of priority charges for transfer to its sinking fund as within the sinking fund trust. On this view, each year it was the equitable duty of the Trustees of the Water District, if there were water revenues available for the purpose, to pay to or set aside for its sinking fund a sum equal to not less than one per cent of the entire indebtedness of the District or so much thereof as the available residue of rates would permit. In determining the annual distributable surplus of income for any year we must "regard as done that which ought to be done" and actual authorized current payments to the sinking

fund must be given favorable consideration, and payments not made or charged, equal to not less than one per cent of the indebtedness of the District or so much thereof as available rate revenue residues permit, must be treated as if made and charged. In this accounting the Water District is entitled to credit for what it did pay and what, by the mandate of its Charter, it ought to have paid.

### CUMULATION OF DEFICITS.

Counsel for the Kennebec Water District asserts the right of the Utility to cumulate its annual water rate deficits, if there be such, and offset them against any surpluses of rate revenues in subsequent years. As explained on the brief, the term "deficit" as here used does not refer to "operating at a loss" but to the amount by which the gross rate revenues in a given year fail to equal the deductions to be made before there is a surplus for distribution. This claim of right to cumulate deficits cannot be sustained. A reading of Pars. I-IV of Sec. 11 of the Charter convinces this Court that the Legislature intended that rate revenues should be collected and disbursed on an annual basis and surpluses, if there are any, determined and distributed at the end of each year independent of those of all other years. To cumulate rate deficits, or really surplus deficits, and charge them to rate revenues of later years would directly violate the legislative mandate as we interpret it.

### MISCELLANEOUS.

In view of the conclusions which have been reached upon the major issues actually involved in this case it is unnecessary to discuss or pass upon the propriety and legality of various income and capital expenditures which are sharply criticized but do not materially affect the right of the City of Waterville or other municipal members of the District to share in surpluses of rate revenues in the periods when the expenditures were made. No more is it necessary to determine whether there

should be added to allowable deductions for Extensions and Renewals certain items classified as Additions and Improvements by some of the accountants. They, too, seem to be immaterial here. Upon the pleadings the only question that need be decided is whether there has been any surplus of rate revenues in any year, and the aggregate thereof, which the Kennebec Water District ought to distribute to those entitled thereto under the provisions of the Charter, with appropriate accompanying provisions as to payment.

Tabulations have been prepared which portray the results of the application of the conclusions which have been reached in this case. As it is conceded that until 1912 no annual distributable surplus of income existed, we begin with that year. Figures used as a basis of computation are taken from extracts from the books of the Water District prepared by its officers and by accountants which on this record must be accepted as correct. The computations include only income from rate revenues and do not include incomes upon sinking fund investments which belong to that fund and to its beneficiaries, or other income items which have no proper place in the determination of distributable annual surpluses under Paragraph IV Section 11 Chapter 200 P. & S. L. 1899. Inasmuch as under Paragraph IV Section 11 it is only when "any surplus remain at the end of the year it shall be divided" accounting periods of less than a year are not and cannot be, on the data at hand, considered separately but are made a part of the account for the following year. The computations in the form of tabulations are as follows:

COMPUTATIONS OF SURPLUS OR DEFICIT OF ANNUAL
INCOMES FROM RATE REVENUES.

|  | 1912 | 1913 | 1914 | 1915 |
|---|---|---|---|---|
| Book Net Profit | 25,302.97 | 18,606.94 | 24,280.94 | 24,584.33 |
| Depreciation | 15,458.91 | 10,383.84 | 16,000.00 | 15,617.50 |
|  | 9,844.06 | 8,223.10 | 8,280.94 | 8,966.83 |

| Extensions and Renewals | 880.77 | 2,405.58 | 15,921.43 | 3,035.86 |
|---|---|---|---|---|
| | 8,963.29 | 5,817.52 | *7,640.49 | 5,930.97 |
| Sinking Fund Reserve | 9,500.00 | 9,500.00 | 9,500.00 | 9,500.00 |
| *Red | *536.71 | *3,682.48 | *17,140.49 | *3,569.03 |
| | 1916 | 1917 | 1918 | 1919 |
| Book Net Profit | 31,808.79 | 30,324.85 | 40,198.17 | 24,290.63 |
| Depreciation | ***17,500.00 | 15,000.00 | 22,500.00 | 15,000.00 |
| | 14,308.79 | 15,324.85 | 17,698.07 | 9,290.63 |
| Extensions and Renewals | 3,774.54 | 12,634.73 | 4,048.74 | 4,457.35 |
| | 10,534.25 | 2,690.12 | 13,649.33 | 4,833.28 |
| Sinking Fund Reserve | **11,083.33 | 9,500.00 | 14,250.00 | 9,500.00 |
| | *549.08 | *6,809.88 | *600.67 | *4,666.72 |

***Allocation of $2500    **Allocation of $1583.33    *Red

In 1915 the fiscal year was changed to begin and end on June 30th whereas prior thereto April 30th had been the date and, as a result, two additional months must be accounted for and equitably pro rata allowances for depreciation and payments to Sinking Fund, although not actually made, allocated to this interim period. Due regard for the right of the Utility and the Public to preserve the integrity of the property devoted to the public service and the Bondholders, the integrity of the sinking fund, equitably demands this allocation as against an apparent surplus existing only by reason of the hiatus in accounting periods and in no event distributable until the end of the year. If the moneys represented by these allocations have been diverted by the Utility, restoration to the proper accounts should be made and adjustments made accordingly. To allow the moneys to be divided as a distribut-

able surplus of rate revenues has no warrant in law or equity. For convenience the period between April 30 and June 30, 1915, is included in the account for the year 1916 and made a part thereof. A similar situation arose in 1917-1918 when the fiscal year was changed and made to correspond with the calendar year. This time six months intervened between fiscal years and that period is included in the 1918 computation.

|  | 1920 | 1921 | 1922 | 1923 |
|---|---|---|---|---|
| Book Net Profit | 4,466.63 | 332.46 | 32,599.06 | 44,887.44 |
| Depreciation | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 |
|  | *10,533.37 | *14,667.54 | 17,599.06 | 29,887.44 |
| Extensions and Renewals | 9,854.06 | 20,658.52 | 8,104.26 | 23,940.75 |
|  | *20,387.43 | *35,326.06 | 9,494.80 | 5,946.69 |
| Sinking Fund Reserve | 0,000.00 | 0,000.00 | 9,720.00 | 10,380.00 |
| *Red | *20,387.43 | *35,326.06 | *225.20 | *4,433.31 |
|  | 1924 | 1925 | 1926 | 1927 |
| Book Net Profit | 39,687.24 | 46,291.90 | 53,025.00 | 32,320.78 |
| Depreciation | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 |
|  | 24,687.24 | 31,219.90 | 38,025.00 | 17,320.78 |
| Extensions and Renewals | 16,605.26 | 19,761.35 | 19,350.02 | 34,457.76 |
|  | 8,081.98 | 11,458.55 | 18,674.98 | *17,136.98 |
| Sinking Fund Reserve | 20,760.00 | 19,586.67 | 19,000.00 | 19,000.00 |
| *Red | *12,678.02 | *8,128.12 | *325.02 | *36,136.98 |

During this period in 1924 and thereafter, payments at the rate of at least 2% annually were credited to the Sinking Fund Reserve and paid apparently in so far as possible out of available rate revenues with resort to Profit and Loss for the balance as and when necessary. The account of 1927 is incom-

plete and computation for that year is necessarily in part estimate but it is conceded that there was no distributable surplus of rates that year.

| | 1928 | 1929 | 1930 | 1931 |
|---|---|---|---|---|
| Book Net Profit | 47,537.66 | 51,218.44 | 47,777.18 | 46,454.44 |
| Depreciation | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 |
| | 32,537.66 | 36,218.44 | 32,777.18 | 31,454.44 |
| Extensions and Renewals | 19,690.59 | 23,270.27 | 19,829.25 | 19,992.94 |
| | 12,847.07 | 12,948.17 | 12,947.93 | 11,461.50 |
| Sinking Fund Reserve | 19,000.00 | 19,000.00 | 21,583.33 | 17,000.00 |
| *Red | *6,152.93 | *6,051.83 | *8,635.40 | *5,538.50 |

| | 1932 | 1933 | 1934 | 1935 |
|---|---|---|---|---|
| Book Net Profit | 47,360.80 | 55,334.99 | 49,776.41 | 52,034.23 |
| Depreciation | 15,000.00 | 15,000.00 | 15,000.00 | 15,000.00 |
| | 32,360.80 | 40,334.99 | 34,776.41 | 37,034.23 |
| Extensions and Renewals | 18,670.94 | 15,878.12 | 16,406.03 | 8,563.95 |
| | 13,689.86 | 24,456.87 | 18,370.38 | 28,470.28 |
| Sinking Fund Reserve | 19,125.00 | 25,500.00 | 25,500.00 | 25,500.00 |
| *Red | *5,435.14 | *1,043.13 | *7,129.62 | 2,970.28 |

| | 1936 |
|---|---|
| Book Net Profit | 50,013.89 |
| Depreciation | 15,000.00 |
| | 35,013.89 |
| Extensions and Renewals | 10,955.29 |
| | 24,058.60 |
| Sinking Fund Reserve | 25,500.00 |
| *Red | *1,441.40 |

Since 1933 the Kennebec Water District has annually taken and credited to its Sinking Fund Reserve the maximum 3% allowance therefor authorized in Paragraph IV Section 11 of its Charter, $850,000 being the amount of its outstanding funded debt during this period.

The Complainant's contention that annual surpluses of income, aggregating $289,843.09, have been accumulated by the Kennebec Water District through the years 1912-1936 and are now distributable, is not tenable. This purported aggregate of surpluses is obtained in major part by disregarding all annual depreciation allowances, which cannot be sanctioned, and consistently adding to record Book Net Profits, income items foreign to current rate revenues from which alone distributable annual surpluses can arise under the Charter. As the computations exhibited show, the only annual surplus of rate revenues which the Kennebec Water District may be called upon to divide accumulated in 1935, a year in which all priority charges against earnings had been fully met. This result is not at all at variance with the principle underlying the rate surplus provision of the Charter. As is well said in relation to a similar provision in the Act incorporating the Portland Water District, "There is a provision in the Portland charter for dividing any surplus among the cities constituting the district but it is obvious that this cannot be authority for fixing rates calculated to provide a surplus. It is intended only to meet the impossibility of foretelling income with mathematical exactness." *Knowlton* v. *Farmington Village Corp.*, supra. This, we think, is a correct interpretation of the legislative policy disclosed in the provisions of Section 11 Chapter 200 as to rates and the division of any surplus thereof among the municipalities composing the Kennebec Water District. The right of the municipalities to share in annual rate surpluses extends only to actual surpluses over and above prior authorized charges upon the rates arising out of the "impossibility of foretelling income with mathematical exactness." No managerial policy

or accounting practice can be allowed to abridge or enlarge this right. The Charter on this point is mandatory.

It appearing that in 1935 the City of Waterville contributed 83.465 per cent and the Inhabitants of the Town of Fairfield, which has succeeded to the rights of the Fairfield Village Corporation, contributed 16.535 per cent to the gross earnings of the Kennebec Water District by way of water rates, these municipalities are entitled to share in the distributable surplus of that year upon that pro rata basis under P. & S. L. 1899 c. 200 ♯11 Paragraph IV. Their claims therefor are not barred. It is the duty of the Kennebec Water District, therefore, to pay $2,479.14 to the City of Waterville and $491.14 to the Inhabitants of the Town of Fairfield as their respective shares of that distributable surplus. Interest upon the amount of each share, from the date of entry of the Bill to entry of Judgment, should be allowed.

The accounts in this case being of great complexity and unduly difficult to determine and adjust in an action at law, jurisdiction in equity has been assumed. *Pomeroy's Eq. Jur.* ♯1421, 1 *Am. Jur.*, 301, *Whitehouse Eq. Pr. First Ed.*, 120. Compliance with the stipulations of the Certificate of the Report requires that the case be remanded to the Supreme Judicial Court sitting in Equity, from which it originated, for a Decree in accordance with this Opinion. The Complainant should be allowed its costs on this Report and in the court below but only as against the Kennebec Water District.

> *Case remanded for Decree in accordance with this Opinion.*

BARNES, C. J., sat at arguments but did not participate in the opinion.