## MAINE TURNPIKE AUTHORITY et al.

### v.

### Joseph E. BRENNAN, Attorney General, State of Maine.

Supreme Judicial Court of Maine.

July 24, 1975.

Verrill, Dana, Philbrick, Putnam, & Williamson, by Roger A. Putnam, P. Benjamin Zuckerman, Portland, Frank E. Hancock, York, Pierce, Atwood, Scribner, Allen & McKusick, by Vincent L. McKusick, Daniel E. Boxer, Portland, for plaintiffs.

John M. R. Paterson, Asst. Atty. Gen., Doyle & Fuller, by John R. Doyle, Craig H. Nelson, Augusta, for defendant.

Before DUFRESNE, C. J., and WEATHERBEE, POMEROY, WERNICK, ARCHIBALD and DELAHANTY, JJ.

DELAHANTY, Justice.

The Maine Turnpike Authority (hereinafter the Authority) seeks a declaratory

judgment concerning its right and power to add additional lanes to the Maine Turnpike. At issue is the construction of the Enabling Act under which the Authority is governed. We declare that the Authority's conduct in building additional lanes is without warrant in the provisions of the Enabling Act and is therefore forbidden. At the end of this opinion, in our mandate, we frame and render our formal and complete declaratory judgment.

The provenience of the present action may in large degree be ascribed to happenstance. In 1971 the Authority, pursuant to a recommendation of its consulting engineers, undertook a comprehensive program of improvements to the southernmost section of the Maine Turnpike. One of these improvements was the enlargement of the Turnpike from a four-lane road to a six-lane road by the construction of two additional lanes, with the aim of eventual expansion of the Turnpike to eight lanes. The Authority actually built several miles of new lanes and was continuing to build in order to finish its anticipated program.

At this point the State Department of Environmental Protection sought an opinion from the Attorney General as to whether the Authority's program and conduct in building additional lanes, and in expanding bridges to accommodate the additional lanes, were subject to the requirements of the Site Selection Law. See 38 M.R.S.A. § 481 et seq. The Attorney General answered the inquiry by an interdepartmental memorandum. The memorandum expressed the Attorney General's opinion that the Authority was indeed subject to the Site Selection Law. The memorandum further stated the opinion of the Attorney General that the Authority had exceeded the powers conferred in its Enabling Act by financing the building of the additional lanes out of revenues obtained from tolls.

Faced with the Attorney General's memorandum, the Authority sought a declaratory judgment to ascertain the proper extent of its powers under the appropriate laws and regulations. The Authority was joined in its action by the Maine National Bank and the First National Bank of Boston. These Banks were trustees of the toll revenues under the Authority's Trust Indenture. As trustees, the Banks had released trust moneys for the building of the additional lanes. The Attorney General was named as defendant in the declaratory judgment action.[1] Subsequently, Donald M. Liddell qualified as an intervenor-defendant representing the interest of those bondholders who objected to the use of toll revenues for the building of additional lanes.

The case was presented to the Superior Court on an agreed statement of facts. Supplementary testimony was taken at a hearing before the court. On agreement of all the parties, and with the concurrence of the Superior Court, the case was reported to the Law Court under M.R.Civ.P. 72(b).

Until the entry of an adequate judgment declaratory of its rights, the Authority has suspended the road construction at issue. Additionally, the Authority has stated that it will comply with the Site Selection Law in connection with future construction projects. The Attorney General, for his part, has made clear that the objections voiced in his memorandum related only to the expansion of the Turnpike by adding travel lanes or by expanding bridges. He did not question the Authority's interest in the installation of median barriers, the redesigning of shoulders and embankments, or the repaving and other maintenance aspects of the Authority's program.

Thus clarified, the issues presented to this Court reduce themselves to one basic,

1. Joseph E. Brennan has since succeeded Jon A. Lund as Attorney General of the State of Maine. Pursuant to M.R.Civ.P. 25(d)(1), Mr. Brennan, in his capacity as Attorney General, is hereby substituted as of March 10, 1975, for Mr. Lund as a named party defendant.

necessary question: Is the Authority empowered by its Enabling Act to apply toll revenues either to build additional lanes or to expand turnpike bridges and overpasses to accommodate these lanes? We answer in the negative.

■ At the outset we must consider the propriety of the Authority's action under the Declaratory Judgments Act. See 14 M.R.S.A. § 5951 et seq. The Authority's concern about the legal status of its conduct arose from a memorandum of the Attorney General to one of the State Departments. This memorandum did not purport to be official action touching upon the Authority, though of course it may have formed an eventual basis for such action. But we do not think the Authority was obliged to passively await a complaint from the Attorney General or from the Department of Environmental Protection or any other official act of the State tending to enforce the State's view of the applicable law. The Authority viewed the very pronouncement and circulation of the memorandum as impairing the ability of the Authority to discharge what it conceived to be its proper functions and public responsibilities under its legislative mandate. See generally *First National Bank of Boston v. Maine Turnpike Authority*, 153 Me. 131, 155–56, 136 A.2d 699, 713 (1957). Since the Authority seeks a declaration of its rights relative to its basic statutory source, the Enabling Act of 1941, the Authority's present action appears well within the mainstream of the liberal policy of declaratory relief marked out and followed by this Court. See *Berry v. Daigle*, Me., 322 A.2d 320, 325 (1974) and cases cited therein.

■ Moreover, the prerequisite of justiciability is satisfied on the facts presented. Although the Declaratory Judgment Act expands the range of available relief, it does not relax the requirements of justiciability necessary to present the court with a judicable controversy. *Berry, supra*, 322 A.2d at 325. To establish a justiciable controversy proper for a declaratory judgment, the complainant must establish a claim of right buttressed by a sufficiently substantial interest to warrant judicial protection. Id. at 326. Here, the Authority claims a right under its Enabling Act to build additional lanes and bridges. The Attorney General, in a colorably official act, has opposed that right. That the Authority has a substantial interest in the proper construction of its Enabling Act and in the facilitation of Turnpike travel, we may take to be self-evident. Thus we are presented with a definite and concrete controversy touching the legal relations of parties having adverse legal interests. *Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*, 300 U.S. 227, 240–41, 57 S.Ct. 461, 464, 81 L.Ed. 617, 621 (1937). The controversy is real and substantial; it admits of an immediate and definite determination of the legal rights of the parties; therefore the judicial function may be properly exercised although the adjudication of the rights of the litigants may not require the award of process or the payment of damages. Id. at 241, 57 S.Ct. at 464, 81 L.Ed. at 621.

■ Our discussion of the powers of the Maine Turnpike Authority necessarily must begin with the statute which gave life to the Authority, Priv. & Sp.L., Ch. 69 (1941) (hereinafter the Enabling Act). The Authority contends that the Enabling Act, by its own terms, provides for the interpretation and enlargement of the Authority's powers through the Trust Indenture subsequently entered into by the Authority and its bondholders. We disagree with this view of the Authority's basic charter rights and powers. Those rights and powers intrinsically derive from the statutes which called the Authority into existence. See *City of Waterville v. Kennebec Water District*, 138 Me. 307, 318, 25 A.2d 475, 479 (1942). While the Authority is entitled to such incidental implied powers as are necessary to carry out its express powers and to vindicate its public purpose, the Enabling Act remains its basic

organic law and the measure of its rights and powers. See *State v. Fin & Feather Club*, Me., 316 A.2d 351, 355 (1974).

Thus, § 4(a)(4) of the Enabling Act, headed "Powers," provides that the Maine Turnpike Authority shall have powers "to construct, maintain, reconstruct and operate a toll turnpike from a point at or near Kittery in York county to a point at or near Fort Kent in Aroostook county." Section 1 explains that the Authority is authorized and empowered to construct, operate and maintain a turnpike "in order to facilitate vehicular traffic between the southwestern and northeastern sections of the state of Maine." Section 11(c) requires that the tolls imposed by the Turnpike "shall be so fixed and adjusted as to provide a fund at least sufficient . . . to pay: (1) the cost of maintaining, repairing and operating the turnpike; and (2) the bonds and the interest thereon, and all sinking fund requirements, and other requirements provided by the resolution authorizing issuance of the bonds or by the trust indenture as the same shall become due."

The essence of the Authority's position in construing the above core provisions of the Enabling Act appears to be as follows: 1) that the furtherance of the legislative policy of facilitating vehicular traffic requires the Authority to be afforded a broad latitude in interpreting and applying its powers; 2) that the building of additional lanes may be justified within the Authority's powers "to construct, maintain, reconstruct and operate a toll turnpike;" 3) that toll revenues may be used in building the additional lanes because the building of the lanes may be viewed as "maintaining, repairing and operating the turnpike;" and 4) that in any event tolls may be used for purposes other than those above listed, because § 11(c) requires only that the tolls be "at least sufficient" to satisfy the listed statutory uses.

■ Additionally, the Authority argues that certain sections of the Trust Inden-ture entered into between the Authority and the trustees for the bondholders confer upon the Authority more explicit sanction for "extraordinary" undertakings such as the adding of new lanes and bridges. The Authority contends that the terms of the Trust Indenture are effectively incorporated by reference in § 6(22) of the Enabling Act which authorizes "[t]he performance by the authority of any and all such acts and things as may be necessary or convenient or desirable in order to secure its bonds or in the absolute discretion of the authority as will tend to make the bonds more marketable notwithstanding that such acts or things may not be enumerated herein." Section 6(23) refers to the discretion of the Authority to assure that its bonds are properly and soundly marketed in accordance with the powers detailed in twenty-three enumerated sub-sections. We note that the whole of § 6 is directed to provisions concerning the issuance of bonds. We think that § 6(22) must be read in the context of the Section as a whole, by which the Authority is granted the broadest of powers in marketing and issuing its bonds and in entering into covenants and indentures to secure the prudent and advantageous management of its bonds. We do not believe that the "absolute discretion" conferred by § 6(22) has rendered the notion of statutory constraint a nullity. The Authority is a statutory instrumentality of limited powers. Any effort of the Authority to arrogate to itself a claim of absolute discretion to build, widen, or finance as it pleases is offensive to fundamental principles of democratic control and is to be resisted.

■ It is true that in *First National Bank of Boston, supra*, this Court had occasion to construe at some length the Trust Indenture of 1953. 153 Me. at 166–69, 136 A.2d at 719–20. But in that case the Court's attention was directed to the effect of a subsequent legislative enactment on the pre-existing contract, under the Trust Indenture, between the Authority, its bondholders, and their trustees. And the Court

was careful to speak of the Indenture as existing "pursuant" to the Enabling Act of 1941 and as having been "adapted" to that Act. Id. at 166, 136 A.2d at 718–19. Plainly, the Indenture is an instrument subordinate to the Enabling Act. No powers may be contrived from the Trust Indenture which do not find warrant in the language of the Enabling Act. See *City of Waterville, supra*, 138 Me. at 318, 25 A.2d at 479; cf. *City of Auburn v. Paul*, 110 Me. 192, 202–03, 85 A. 571, 576 (1912).

█ It is an undisputed fact in the present controversy that the revenues consumed in the building of the additional lanes are revenues derived from tolls. The Trust Indenture provides for the trustee to allocate funds to a Reserve Maintenance Fund according to requests variously made by the Authority's consulting engineers and duly approved by the appointed members of the Authority. Under § 11(c)(1) & (2) of the Enabling Act, it would appear that the Reserve Maintenance Fund is a fund appurtenant to the main sinking fund out of which the interest on the bonds is to be paid and the principal of the bonds eventually to be redeemed. Of course, a sinking fund is a trust fund and bondholders are entitled to have its integrity maintained and to compel the restoration of moneys unlawfully diverted from the fund to other purposes. *City of Waterville, supra*, 138 Me. at 327, 25 A.2d at 483. The interest of the bondholders in the sinking fund appears especially important when, as here, the tolls and revenues of the Turnpike are the primary assets to which the bondholders can look for security, since § 8 of the Enabling Act precludes the mortgaging of the Turnpike itself or any part thereof. Section 11(d) provides that except for the cost of maintaining, repairing, and operating the Turnpike, the tolls and revenues derived from the Turnpike shall be set aside in a sinking fund which is charged with ultimate payment of bond interest and principal and which is to serve as a fund for the benefit of all bonds. In effect, under the provisions of § 11(c)(1) & (2) and

§ 11(d), governing the application of tolls and revenues, the toll revenues are dedicated to the particular purpose of retiring and securing the Authority's bond obligations.

█ However, the Authority is not debarred from access to the toll revenues simply because the revenues are earmarked for the ultimate retirement of funded debt. The Authority has broad powers under § 11(c)(1) to apply toll revenues to pay the cost of maintaining, repairing and operating the Turnpike. It remains to consider whether the Authority's actual conduct in undertaking to add four additional lanes to the Turnpike, and in actually building two, was properly conceived and executed within the statutory purposes permitted under § 11(c)(1).

Whether the Authority may apply toll revenues to the building of additional lanes depends on the character of the Authority's activity. If the lane-building is deemed to be an aspect of maintaining, repairing, and operating the Turnpike, then toll revenues may be applied in accordance with § 11(c)(1). The essence of our opinion is that the widening of the Turnpike by the construction of additional lanes cannot be justified as maintaining, repairing, or operating the Turnpike. Therefore, such lateral expansion as the building of additional lanes may not be financed out of toll revenues.

█ Our reasons for this holding are twofold: 1) the statutory language of § 11(c)(1) will not bear a construction which allows an expansion of such a magnitude and duration as the building of additional lanes to be charged against the current income of the Turnpike from toll revenues; and 2) the entirety of the Enabling Act preserves the distinction that capital expenditures, considered as part of the cost of constructing the Turnpike, are to be financed by the issuance of bonds, not by the free diversion of toll revenues from their primary purposes of maintaining the Turnpike and securing the bondholders.

As to the words of the statute, they authorize the use of toll revenues for the maintenance, repair, and operation of the Turnpike. Construing these words together, we hold that they refer to the current running expenses of the Turnpike. See *City of Waterville, supra*, 138 Me. at 320, 25 A.2d at 480. Thus, "maintenance" includes annual upkeep and, to a degree, repairs necessary to sustain the operation of the Turnpike. See id. On other occasions, we have construed "maintenance" to mean a keeping in a state of efficiency or a refusal to suffer decline. See *Loose-Wiles Biscuit Company v. Deering Village Corporation*, 142 Me. 121, 130–31, 48 A.2d 715, 719–20 (1946). "Operate" we have construed to mean "to put into activity" or to continue in activity. See *State of Maine v. Canadian Pacific Railroad Company*, 125 Me. 350, 355–56, 134 A. 59, 61 (1926). The Authority does not contend that the building of additional lanes may be justified as within the ordinary meaning of "repair" of the Turnpike.

We do not pretend that the above restatements of our previous construction of the words appearing in § 11(c)(1) are dispositive of the questions presented. The answer does not lie within the immutable nature of the written words of the statute. The answer, to the best extent we can give one, lies in the context of the words within the larger locus of the statute, and of the statute itself as the solemn expression of the legislature. The words prescribing the uses of toll revenues—maintain, repair, and operate—call into mind the ongoing sustenance of an established entity. We note that § 11 is entitled "Maintenance of the turnpike." We believe this Section of the Enabling Act was intended by the legislature to restrict the application of toll revenues to current expenses that are recurring and ordinary in nature. Thus construed, § 11 presents an assurance that toll revenues will be applied only to those necessary and incidental costs appropriate to sustain a safe, modern, and extant highway. We do not conceive of the apparently indefinite lateral expansion of the completed turnpike as being among those necessary or incidental costs.

It follows, then, that the building of additional lanes cannot be considered as a current expense of maintenance, repair, or operation to which toll revenues may be applied. The Authority anticipated adding lanes which could at least double the paved laned area of the roadway. We think the financing of this project is well within the principles expressed by this Court in *City of Waterville, supra*, 138 Me. at 326, 25 A.2d at 482:

> Additions to the plant to meet increased demand . . . and the replacement of inadequate and worn out parts of the plant with something larger, more valuable or better suited to present needs or more economical to operate effecting new additions or alterations to the condition of the plant which are not mere acts of restoration involved in renewals or repairs come within the meaning of Additions and Improvements. In so far as the additions and substitutions are only renewals and repairs, the cost thereof is chargeable to earnings. Costs in excess thereof should be charged to capital.

It is true that in *City of Waterville* the Court premised its discussion of capital expenditures on the unanimous conclusion of the then-present expert witnesses. But we are not here concerned with characterizing the additional lanes as capital expenditures in the context of bookkeeping or the abstract charging of accounts. We believe that the nature of the additional lanes as capital expenditures reinforces our view that the language of § 11(c)(1) regarding the proper objects of toll revenues precludes the use of such revenues for basic capital expenditures "which are not mere acts of restoration involved in renewals or repairs."

However, we do not deny and do not wish to appear to deny that there are expenditures which are capital in nature, in

that they involve the utilization of assets with a useful life, which are permitted in the context of maintenance, repair, and operation of the Turnpike and may properly be financed out of toll revenues. Median barriers are an example. The acquisition and installation of miles of guardrails involve substantial expenditures. But we believe that the purpose served is the reasonable maintenance and operation of the Turnpike in a safe condition. The Authority urges that the adding of lanes will also make the Turnpike more safe, in addition to accommodating future traffic use projected by the Authority and its consulting engineers. We do not affirm or deny that proposition. We simply state that we do not believe that a twofold enlargement of the roadway can be brought within the terms of permissible maintenance and operation in the same sense as can the installation of guardrails. And in the context of the limitations on the objects of toll revenues, we hold that the building of additional lanes is not to be reasonably implied as among the powers of the Authority.

The legislature intended the Turnpike to be built for a public purpose and to be endowed with powers suitable to accomplish that purpose. But the legislature also intended the Turnpike to be built to a conclusion. The legislature conceived of, and ordained to be executed, a finite undertaking. The Attorney General has urged that the legislature did not intend for the Authority to build the Turnpike once and then, some years after construction, on asserted grounds of need, to go back and double the roadway, in effect building the Turnpike again. We agree. The Authority's conduct in building additional lanes does not conform to a reasonable construction of the powers conferred by its Enabling Act.

 We believe that the Enabling Act supports this position. In § 3(d), "Definitions," the term "cost of the turnpike," while given extensive scope, is limited throughout to the cost of the original construction of the Turnpike and its necessary and incidental features. Section 4(a)(4), "Powers," then empowers the Authority "to construct, maintain, reconstruct and operate a toll turnpike." But § 7(1) & (2) jointly provide that proceeds from the sale of bonds shall be applied "solely" to the payment of "the cost of the turnpike" and to the appurtenant fund, and that a lien in favor of the bondholders is created on such moneys until so applied. We infer and conclude from these Sections of the Enabling Act that the legislature intended the bond proceeds to be used solely and exclusively for the cost of the Turnpike, that is, for the construction of each authorized portion or extension of the Turnpike. Proceeds not so applied would be placed in the appurtenant fund. In view of these restrictions on the application of bond proceeds, we cannot rightly infer that toll revenues may be applied to objects not reasonably within the cost of maintaining and operating the Turnpike. A guardrail, for example, strikes us as reasonably within those costs and warranted by a manifest concern for the public safety. The construction of new lanes is quite different and appears inconsistent with the entire structure of the Act, which finances road construction out of bond proceeds and controls bond proceeds as they are applied to that purpose.

The Authority urges that even if the additional lanes may not be justified as maintenance or operation of the Turnpike, the lanes may nevertheless be financed by toll revenues. Pointing out that it is empowered under § 4(a)(4) to "reconstruct" the Turnpike, the Authority contends that the building of the additional lanes is but a "reconstruction" of the existing roadway. The Authority then alludes to the language of § 11, which states that the Authority shall fix tolls so as to provide a fund "at least sufficient" to pay the cost of maintaining, operating, and repairing the Turnpike. The Authority argues that since the building of additional lanes is within its power to "reconstruct" the Turnpike, and

since tolls need only be "at least sufficient" to pay the costs of maintenance, repair, and operation, the Authority may apply any excess of toll revenues to the permissible power of "reconstructing" the Turnpike by building additional lanes.

■■■ Even if the addition of lanes were deemed in any way a reconstruction of the Turnpike, we do not think the lanes could be financed out of tolls. That tolls must be "at least sufficient" to pay the cost of the permitted statutory objects does not mean that any toll revenues not expended on these objects may be expended according to the asserted general powers of the Authority. Simply put, tolls may be set by the Authority at such levels as will assure payment of the cost of maintenance, repair, and operation. The fact that there are unexpended toll revenues does not mean that the restrictions on the uses of toll revenues may be avoided in favor of more generalized powers of expenditure.

■■ The restrictions on the use of toll revenues in the Enabling Act are specific and must be considered as controlling over more general powers unless the statute as a whole demonstrates a contrary intention. *See United States v. City of Chester,* 144 F.2d 415, 421 (3d Cir. 1944). Here, the Enabling Act as a whole expresses an interest in safeguarding the bondholders that is at least not inconsistent with preferring the specific statutory restrictions on the use of toll revenues. Moreover, the word "reconstruction" is omitted from the permitted uses of toll revenues under § 11(c)(1). Importance must be attached to that omission in the construction of the statute, especially since the Authority has not succeeded in establishing the building of additional lanes as a permitted use of toll revenues according to the enumerated statutory categories. Cf. *Martin v. Piscataquis Savings Bank,* Me., 325 A.2d 49, 51 (1974).

In any event, we are satisfied that the activity of the Authority in building additional lanes cannot be justified as within the Authority's general powers · under § 4(a)(4) "to construct, maintain, reconstruct and operate a toll turnpike." We have stated our view that in the Enabling Act the legislature contemplated a program whereby the Turnpike would be built to a conclusion in order that its various extensions may comprise a finished product. The building of the Turnpike, where none existed before, was the "construction" of the Turnpike. "Maintenance" and "operation" we have construed in the context of § 11(c) & (d), and we have held that those words as used in the Enabling Act do not embrace or empower the addition of any number of lanes to the existing roadway.

■■ It remains to consider the powers conferred by the word "reconstruct" in § 4(a)(4) if the Authority is to have any basis for its lane-building activity in the statutory language. In ordinary usage, "reconstruction" means "to construct again; to rebuild; to remodel; to form again or anew." Webster's New International Dictionary (2d ed. 1955); see *Berry v. McConnell,* 187 Mo.App. 673, 173 S.W. 100 (1915); *Contas v. City of Bradford,* 206 Pa. 291, 55 A. 989, 990 (1903). To us, the essence of reconstruction is the rebuilding or construction again of an object which as an entity has been lost, destroyed, or deteriorated. See *Fuche v. City of Cedar Rapids,* 158 Iowa 392, 139 N.W. 903, 904–05 (1913). Thus, for a power to reconstruct to be properly exercised, it would appear that the object to be reconstructed must have at one time existed in an original character, from which it has presently lapsed and to which it is proposed to be reconstructed. See *Vincent v. Frelich,* 50 La.Ann. 378, 23 So. 373, 375 (1898).

We think it follows that the building of additional lanes cannot be justified under the Authority's power to reconstruct the Turnpike. These lanes are being constructed for the first time; they are not a reconstruction of the roadway which the Authority was charged to construct, maintain, and operate. Reading together the powers conferred on the Authority by §

4(a)(4), the power to reconstruct ensures that the Authority will be able to preserve its assets in sound operating condition. If the assets are destroyed or lost, they may be reconstructed in toto. The distinction we draw is that new assets may not be created based on a power to reconstruct. In the context of the Enabling Act, "reconstruct" ensures that the assets of the Authority may reasonably be rebuilt or restored so as to preserve or enhance their original efficiency.

■ Thus, the Authority cries wolf when it fears that its power to reconstruct will be confined to an atom for atom replacement of its existing assets. The view of reconstruct that we propound permits the rebuilding of a structure reasonably similar to the original construction, although not necessarily an exact reproduction. See *City of Seattle v. Northern Pac. Ry. Co.*, 12 Wash.2d 247, 121 P.2d 382, 386 (1942). But on this account, the Authority cannot "reconstruct" lanes that never existed. Neither can the Authority claim that any "reconstruction" of the original roadway entails a reconstructed object half again as wide as the one originally built. See id.

The Authority has presented its case to this Court on the ground that the need for the additional lanes was great, in terms of both convenience and safety, and that the powers of the Authority were adequate to accomplish its proposed aims. We have held and declared that the building of additional lanes exceeds the warrant of the Enabling Act. As to the Authority's assertion of necessity, we venture no opinion. The assertion of necessity, while credible on its face, cannot override our view of judicial necessity. It is for the courts and not government agencies to exercise ultimate responsibility to construe the language used by the legislature. See *Zuber v. Allen*, 396 U.S. 168, 192–93, 90 S.Ct. 314, 327–28, 24 L.Ed.2d 345, 360 (1969). This Court is under no obligation, and takes no opportunity, to endorse or criticize the value of specific legislative enactments. *State*

*v. Rush*, Me., 324 A.2d 748, 757 (1974). It is entirely possible that the legislature would be amenable to acknowledge by remedial legislation the manifest needs which the Authority so vigorously asserts. The legislature is equally qualified and competent to respond to legitimate public interests for remedy of governmental wrong. *Berry v. Daigle,* supra, 322 A.2d at 328. We consider recourse to the legislature far more appropriate than the ratification of a fait accompli by judicial fiat. We render our declaratory judgment accordingly.

The entry must be:

Remanded to Superior Court for entry of judgment denying the relief sought and declaring that the building of additional lanes, or the expansion of turnpike bridges and overpasses to accommodate these lanes, is not empowered by the Enabling Act of the Maine Turnpike Authority; that the financing of the additional lanes by tolls and revenues is unauthorized by and exceeds the warrant of the Enabling Act; and that the Authority's power to reconstruct the Turnpike does not embrace the building of additional lanes.

All Justices concurring.