THE FIRST NATIONAL BANK OF BOSTON AND
NATIONAL BANK OF COMMERCE OF PORTLAND,
IN EQUITY
*vs.*
MAINE TURNPIKE AUTHORITY ET AL.

Kennebec.    Opinion, October 15, 1957.

132

*Hutchinson, Pierce, Atwood & Allen,* for the plaintiff.

*H. E. Foster,*
*Verrill, Dana, Walker, Philbrick & Whitehouse,*
*Joseph Gorham & Everett Maxcy,*
*Locke, Campbell, Reid & Hebert,*
*Skelton & Taintor,*
*Linnell, Perkins, Thompson, Hinckley & Thaxter,*
*Sanborn & Sanborn,*
*George Varney,*
*Warren Paine,*
*Bingham, Dana & Gould,* for defendants.

*Frank Harding, Atty. General,*
*James Frost, Asst. Atty. Gen.,*
*Roger A. Putnam, Asst. Atty Gen.,* for State of Maine.

SITTING: WILLIAMSON, C. J., WEBBER, BELIVEAU, TAPLEY, SULLIVAN, DUBORD, JJ.

SULLIVAN, J.   The Maine Turnpike Authority extended its toll road from Portland to Augusta and thus obliged the defendant utilities to relocate or replace some of their pipes, wire lines and other facilities which had been installed in

many portions of extant public ways traversed en route. The Authority has negated all liability for payment of the expense and losses entailed in such transposition or abandonment and the utilities have submitted to the cost under steadfast protest. The resultant outlay and deprivations have been of serious financial magnitude for the utilities.

Pursuant to the Uniform Declaratory Judgments Act, R. S., c. 107, §§ 38 through 50, and on behalf of the bondholders, the plaintiff banks as trustees under the indenture of trust of the Authority have instituted this bill in equity against the Authority, the utilities and the Attorney General to have resolved the controversy as to who must sustain the expense of relocation and the cost of replacement. By agreement amongst all parties the issue is restricted to liability without fixation of the amount of any damages.

Before construction of the turnpike extension the legislature had accorded to the utilities by charter, statute or statutory validation, and without charge, the permit to maintain in the public ways their facilities and the utilities had made the installations. The purport of such legislative privilege is of prime concern in this case and is discovered by court precedents and statutes.

A review of the decided cases of this court is informative.

In *Rockland Water Company* v. *Rockland,* 83 Me. 267 (1891) it was decided that a right by charter to lay pipes in city streets "in such manner as not to obstruct or impede travel thereon" does not afford a right of action against the city which in repairing a street uncovers one of the submerged pipes and exposes it to frost, "in the absence of any improper method in so doing."

*Inhabitants of Paris* v. *Norway Water Company,* 85 Me. 330 (1893) concerns itself primarily with the cataloguing of utility facilities for taxation purposes. P. 332. The decision says, in part:

P. 334. "- - - - Such companies, therefore, by the public license accorded them, take no title in the land - - - -"

P. 335. "- - - - water-mains, pipes, etc., may be considered real estate and taxable where they are located - - - -"

This case of *Paris* v. *Norway* holding that water pipes, hydrants and conduits of a water company, laid in public streets are real estate for the purposes of taxation in the instance of a private corporation chartered by special act of the legislature (P. & S. 1885, c. 369; 1887, c. 46) to lay its installations in public ways "under such reasonable restrictions as may be imposed by the selectmen of said towns," has been excessively interpreted and enlarged in the quest to justify an implication that such a chartered utility is not subject to relocation of its facilities installed in public streets or ways without compensation. Language used in *Readfield Telephone and Telegraph Company* v. *Cyr*, 95 Me. 287 @ 293 and in *Portland* v. *New England Telephone and Telegraph Company*, 103 Me. 240 @ 246, attempts to distinguish those opinions from that of *Paris* v. *Norway,* has been the occasion of misapprehension as to the primary and permanence of the police power.

*Belfast Water Company* v. *City of Belfast,* 92 Me. 52 (1898) arose from a contract between the utility and the city, permitting the utility to lay its pipes in the city street. The utility laid its pipes. The city in altering its sidewalk required the utility to relocate its pipes. The utility brought the action to recover from the city the expense of such relocation and was denied relief. The court said:

P. 58. "- - - - When the company placed its gates in the street of the city under the contract referred to, it did so subject to the right of the city to make such change in the surface of the street and the alignment of the sidewalk as might be necessary to render the street safe and convenient for public

travel. *In making needed repairs and changes in the streets, the city is but an instrument of the state, an agent of the public, and it cannot barter away its rights or fetter its duty to make such repairs and changes.* To subject itself to the expense of changing the appliances of the water company in the streets whenever it became necessary to change them, by reason of repairs, would be a serious impairment of its rights, and an onerous addition to its duties." (Emphasis supplied)

*Brunswick Gas Light Company* v. *Brunswick Village Corporation,* 92 Me. 493 (1899) was an action by a utility which by charter had "the right to lay gas pipes in any of the public streets and highways of the town of Brunswick, the consent of the selectmen of said town having first therefor been obtained." The utility claimed "that its pipes, lawfully in the Brunswick streets, were broken by the defendant in the course of the construction of sewers in said Streets." The court opinion contains the following tenets:

P. 497. "- - - - This is the whole of it. It is not claimed that the acts of the defendant were negligent, unreasonable, unnecessary, or in excess of its statutory rights, and of course we cannot assume them to have been so. The question is fairly presented, whether the defendant, having constructed its sewers in a reasonable and proper manner, can be held responsible for damages which were the natural or necessary result of the exercise of its lawful powers. We think the question must be answered in the negative."

P. 496. "- - - - But this was not an absolute right. It was only a qualified right. It was not paramount, but subordinate. The placing of its pipes in the streets, with the consent of the selectmen, did not give the plaintiff the vested right to have them remain as placed undisturbed. *Its right was subordinate to the rights of the public in the use of the streets; and it was subject to the power of the legislature to authorize additional public uses of*

*the streets, and that, without providing for the payment of compensation for incidental and consequential damages occasioned by such uses. Notwithstanding the provisions in the plaintiff's charter,* we think it cannot be successfully claimed that the legislature did not still possess the power to authorize the construction of sewers in the streets, although by such construction, the plaintiff might be put to inconvenience, damage and loss." (Emphasis supplied)

P. 497. "- -.- - The legislature exercised its power by granting the defendant's charter. The defendant, then, clearly had the right to construct sewers in its streets. If it did so reasonably and properly, it was only in the lawful exercise of its right. It is well settled that when a public corporation does only what by its charter it is authorized to do, and is free from fault or negligence, it is not liable for consequential damages - - - We think this rule is applicable here."

In *Readfield Telephone and Telegraph Company* v. *Cyr,* 95 Me. 287 (1901), a case concerning a permit by general statute to a class of utilities, is found:

@ 290. "The beneficial use of the soil in our highways had been appropriated by the public for public purposes, but the property in the soil still remains in the owner of the adjoining land, who may use it for any purpose, above or below the surface, which does not injuriously interfere with public uses. A telephone is a public use, and the legislature, by virtue of its power of control over the public roads and highways of the State, may grant to a telephone company the authority to erect its lines along or upon such roads and highways, or it may delegate that power to the municipal officers of the several municipalities, as has been done in this State by statute of 1885, c. 378. A telephone company, however, cannot construct its line along the highway at its own pleasure. It is forbidden to do so without first obtaining a written permit from the municipal officers. - - - Nor is this permission,

when once obtained, final and irrevocable and *the use so granted subject to be determined only by the will of the company or the discontinuance of the highway*. The same section further provides that 'after the erection of the lines, having first given such company, persons, associations, or their agents, opportunity to be heard, the municipal officers may direct any alteration in the location or erection of said posts.' These are comprehensive terms. Telephone lines, though affected with a public use, are operated for private gain. Nothing is paid for the valuable privilege of occupying and using the soil of the public roads and highways. The authority to fix the location of the posts, in the first instance, has been wisely given to the municipal officers, and if wisely exercised, the location will be made with a view to existing and probable future conditions. *Yet conditions are constantly changing and, in the growth and improvement of our municipalities, the time may come when it may be desirable to alter the location of one or all of the posts of the line from one side of the street to the other, or from one street to another* - - - The telephone company then has no interest in the soil which supports its posts and lines except a right to occupy it by the permission of the municipal officers, a mere license revocable at will.

P. 291. - - - - "No legal right to the continued use of the enjoyment of the privilege can be acquired by prescription in the face of this statute. No right to such continued use is granted, for the only privilege granted in any particular spot, parcel or portion of land is temporary and not permanent, a mere license revocable at the will of the municipal officers so far as any particular portion of the highway *or any particular highway is concerned,* and not a permanent vested interest in the land itself." (Emphasis supplied)

The court was troubled about reconciling this case with *Paris* v. *Norway, supra.*

*City of Portland* v. *New England Telephone and Telegraph Company*, 103 Me. 240 (1907) was an action for the recovery of taxes upon conduits laid under the surface of the streets by the defendant, a foreign corporation, authorized by special act of the legislature to place its installations under the streets "with the permission and under the supervision of the municipal officers and subject to such rules and regulations as they may from time to time impose." The municipal officers by authorized rules and regulations had reserved full prerogative to revoke or change the location of the facilities of the defendant in city streets whenever such might be deemed necessary or proper. The defendant was obligated to relocate such facilities "whenever ordered to do so by the board of mayor and aldermen." The court ruled that the conduits were not taxable by the city under the prevailing tax statutes. The court said that under the circumstances the permit of the utility to maintain its facilities in the public streets was a mere license revocable at will. The court was at some pains to distinguish the case from *Paris* v. *Norway* but at Page 247 quoted with approval from *Telephone Co.* v. *Terminal Co.*, 182 Mass. 397, a case concerning the assessment of land damages by reason of street discontinuance, as follows:

> '- - - - All the statutes and ordinances upon which the petitioners rely as a justification for their action in constructing conduits in the public streets and as giving them rights of property there, are merely provisions for the regulation of the different public rights in the streets. None of them purports to convey private rights of property. Most of them expressly state the limitations upon the authority given, and make the petitioners subject to possible future proceedings terminating or modifying their rights.

> '*But where there is no such express provision the result is the same. Their rights in connection with the rights of others of the public are subject to reasonable regulation, or even to termination at any*

*time, if the supreme authority acting in the public interest shall so determine.* It follows that they have no rights of property in the street, and their structures that were built therein were personal property which they had a right to remove, and *which could not be subjects for the assessment of damages under statutes of this kind.'* (Emphasis supplied)

The Augusta Turnpike Extension was projected early in 1953 and completed in 1955. Many statutes concerning utility facilities in public ways were in force. R. S. 1944, c. 46, § 11 (P. L. 1951, c. 142, § 2) ; c. 46, § 12, § 13, § 14; c. 46, § 16 (P. L. 1945, c. 293, § 5) ; c. 46, § 17 (P. L. 1951, c. 267, § 1) ; P. L. 1951, c. 267, § 2; R. S. 1944, c. 46, § 19 (P. L. 1945, c. 293, § 7) ; c. 46, § 21, § 22, § 30; c. 46, § 31 (P. L. 1945, c. 293, § 8; P. L. 1951, c. 304, P. L. 1953, c. 224) ; c. 46, § 38, § 40; R. S. 1944, c. 47, § 4, VIII; P. L. 1949, c. 400; P. L. 1951, c. 321, § 6; P. L. 1953, c. 308, § 20.

Permits by statute were available for telephone, telegraph, gas, water, pipe line, heat, power and electric utilities to maintain facilities in public ways. These permits were obtainable from public officers and were "subject also to such rules and regulations as to location and construction as such - - - - officers may designate in their permit." R. S. 1944, c. 46, § 17; P. L. 1951, c. 267, § 1. All facilities entitled to be located and located *"are hereby valid and declared legal and the same shall henceforth be legal structures in said streets and highways until the location thereof shall have been changed in any manner required or authorized by law."* P. L. 1951, c. 267, § 2. (Emphasis supplied) The facilities were to be constructed and maintained so "as not to incommode the use of such roads and streets for public travel." R. S. 1944, c. 46, § 19; P. L. 1945, c. 293, § 7. Telegraph or telephone companies were authorized to sell, lease or buy existing, located facilities. R. S. 1944, c. 46 § 21. Utilities for the transmission of intelligence, heat, light or

power by electricity were eligible for permits from public officers for locating their facilities but the permits were subject to alteration. The located facilities were "deemed legal structures." R. S. 1944, c. 46, § 31; P. L. 1945, c. 293, § 8; P. L. 1951, c. 304; P. L. 1953, c. 224. In municipalities of more than 40,000 inhabitants, the municipal officers, after notice and hearing, might determine that public safety and the public welfare required the revocation of any location of facilities of certain utilities in the public ways but were obliged to supply other suitable locations. R. S. 1944, c. 46, § 38.

There are 7 defendant utilities in the instant case. 4 of them enjoy their rights in public ways from special legislative charters. 3 of them, by general, state, legislative grants to a class of utilities. The water districts only are quasi municipal corporations. The other utilities are private corporations with stockholders. Since the Public Laws of 1895, c. 102, § 5, § 8, c. 103, § 4 (now, substantially, R. S. c. 1954, c. 50, § 11, § 14, § 37) the source of installation rights of utilities in public ways without special charters is legislative by general grant with permits subject to the proper discretion of public officers. One of the telephone companies by special legislation may install facilities in public ways in such manner as not to incommode or endanger the customary public use and with consent of the municipal officers. The gas company by special legislation may install with the consent of the municipal officers and under their prescribed regulations. The water districts by special legislation "may lay pipes in and through streets" and highways. The water districts, therefore, contend that their installations in public ways are more immanent because they derive from special, plenary franchise without any requirement of municipal permits and without reservation as to revocation or alteration. The merits of the present controversy, however, concern themselves primarily with the requirements of public travel and with the police power. The

authorities which follow as well as the Maine decisions which precede establish that, whatever hierarchy of privileges in utility installations there may be, the exigencies of public travel and the police power are unremittingly paramount.

*Lynn and Boston Railroad Company* v. *Boston and Lowell Railroad Corporation,* 114 Mass. 88 (1873) is a case that was litigated between "a horse railroad company" and a steam railroad and affords the following law of public street usage:

> P. 91. "The enactment of a statute authorizing a railroad corporation to construct a road over a given route, necessarily involves a determination by the Legislature that the public exigency requires such road. It may, by a direct provision, authorize the corporation to build its road on a level with any highway which it crosses. In the absence of any express provision, the power of deciding whether public necessity requires that the railroad should be built on a level, is delegated to the county commissioners. - - - - -
>
> "If they so decide, it is an appropriation of the highway to a public use by the authority of the Legislature. It necessarily modifies, to some extent, the general use of the highway, but neither those who have occasion to travel over it, nor a street railway corporation which has a right to use it in common, can object. *They hold their rights to use it in subordination to the power of the public authorities to determine what other use of it is demanded by public necessity."* (Emphasis supplied)

*Boston Electric Light Company* v. *Boston Terminal Company,* 184 Mass. 566, 69 N. E. 346 (1904)

> P. 567. - - -" 'All the statutes and ordinances upon which the petitioners rely as a justification for their action in constructing conduits in the public streets and as giving them rights of property

there, are merely provisions for the regulation of the different public rights in the streets. None of them purports to convey private rights of property. Most of them expressly state the limitations upon the authority given, and make the petitioners subject to possible future proceedings terminating or modifying their rights.' "

*Anderson* v. *Fuller et al.*, 51 Fla. 380 (1906)

P. 392. "- - - And while municipalities may by ordinance grant to individuals and corporations the privilege of occupying the streets and public ways for lawful purposes, such as railroad tracks, poles, wires, gas and water pipes, such rights are at all times held in subordination to the superior rights of the public and all necessary and desirable police ordinances, that are reasonable, may be enacted and enforced to protect the public health, safety and convenience, notwithstanding the same may interfere with legal franchise rights. A water company placing its pipes in the streets under a franchise contract with the city, does so in subordination to the superior rights of the public, through its duly constituted municipal authorities, to construct sewers in the same streets, whenever and wherever the public interest demands; and if in consequence of the exercise of this right, the water company is compelled to relay its pipes, *in the absence of unreasonable or malicious conduct,* it has no cause of action against the corporation for reimbursements on account thereof. - - - - - *The city of Tampa was therefore, not authorized directly or indirectly to burden itself or its citizens with the cost of removing and replacing of the water pipes, gas pipes, telegraph, telephone and electric light poles, drains or conduits or railway tracks that might necessarily have been interfered with in laying its sewers* in the streets. - - - - -" (Emphasis supplied)

*New Orleans Gas Light Company* v. *Drainage Commission of New Orleans,* 197 U. S. 453, 1905.

P. 458. "In the case of the New Orleans Gas Company, 115 U. S. 650, it was held that the complaint, by reason of the franchises granted and agreements made, as fully set forth in that case, had acquired the exclusive right to supply gas to the city of New Orleans and its inhabitants through pipes and mains laid in the streets.

"It is the contention of the plaintiff in error that, having acquired the franchise and availed itself of the right to locate its pipes under the streets of the city, it has thereby acquired a property right which cannot be taken from it by a shifting of some of its mains and pipes from their location to accommodate the drainage system, without compensation for the cost of such changes. It is not contended that the gas company has acquired such a property right as will prevent the Drainage Commission, in the exercise of the police power granted to it by the State, from removing the pipes so as to make room for its work, but it is insisted that this can only be done upon terms of compensation for the cost of removal. This contention requires an examination of the extent and nature of the rights conferred in the grant to the gas company. The exclusive privilege which was sustained by this court in the case of the New Orleans Gas Co. v. Louisiana Light Co., supra, was the right to supply the city and its inhabitants with gas for the term granted. There was nothing in the grant of the privilege which gave the company the right to any particular location in the streets; it had the right to use the streets, or such of them as it might require in the prosecution of its business, but in the original grant to the New Orleans Gas Light and Banking Company the pipes were to be laid in the public ways and streets 'having due regard to the public convenience.' And in the grant to the Crescent City Gas Light Company the pipes were to be 'laid in such manner as to produce the least inconvenience to the city or its inhabitants.' In the very terms of the grant there is a recognition that the use of the streets by the gas company was to be in such manner as to least inconvenience the city in

such use thereof. Except that the privilege was conferred to use the streets in laying the pipes in some places thereunder, there was nothing in the terms of the grant to indicate the intention of the State to give up its control of the public streets, certainly not so far as such power might be required by proper regulations to control their use for legitimate purposes connected with the public health and safety. In the case above cited, in which the exclusive right to supply gas was sustained, there was a distinct recognition that the privilege granted was subject to proper regulations in the interest of the public health, morals and safety.
- - - - -

P. 461.   - - - "There is nothing in the grant to the gas company, *even if it could legally be done,* undertaking to limit the right of the State to establish a system of drainage in the streets. We think whatever right the gas company acquired was subject in so far as the location of its pipes was concerned, to such future regulations as might be required in the interest of the public health and welfare. Those views are amply sustained by the authorities. Natural Water Works Co. v. City of Kansas, 28 Fed. Rep. 921, in which the opinion was delivered by Mr. Justice Brewer, then Circuit Judge; Gas Light & Coke Co. v. Columbus, 50 Ohio St. 65; Jamaica Pond Aqueduct Co. v. Brookline, 121 Massachusetts, 5; In re Deering, 93 N. Y. 361; Chicago, Burlington etc. R. R. Co. v. Chicago, 166 U. S. 226, 254. In the latter case it was held that uncompensated obedience to a regulation enacted for the public safety under the police power of the State was not taking property without due compensation." (Emphasis supplied)

*Southern Bell Telephone and Telegraph Company* v. *State of Florida, ex rel. Ervin,* 75 So. (2nd) 796 (1954)

P. 799. "The statute authorizes the Telegraph Company to use the roads or highways for its facilities so long as such facilities shall not obstruct or interfere with the common uses of said streets.

Even if the proviso in the act had been omitted, it would not have conferred upon the company any absolute or indefeasible right to have such facilities remain in the same place forever. In the only instance, cited supra, where this statute has been before this Court, we held that streets are primarily for the benefit of the traveling public, and that the use of such streets by Telephone Companies was secondary and restricted to the extent that such facilities should not interfere with the common uses thereof. The streets were built first and when the Telephone Company installed its facilities in the streets it did so knowing that if it became necessary in the future to improve such streets in the interest of the general welfare, its facilities would have to be removed, relocated or rearranged. In other words, it knew then that its facilities and business was then and always would be subservient to the rights of the public."

*Scranton Gas and Water Company, Appellant* v. *Scranton City*, 214 Pa. 586, 64 Atl. 84 (1906)

The City of Scranton and a railroad constructed a viaduct from one street to another over the railroad tracks to eliminate a dangerous grade crossing.

The water company had *a legislative grant* to occupy the streets. It had laid its pipes beneath the street where the viaduct was constructed and had long maintained them there. It became necessary to relocate the pipes and conduct them along several other streets because of the viaduct. The water company claimed the cost of relocation, to be paid by the city under its eminent domain process. Recovery was denied by the court.

P. 590. - - - "So far as property rights are concerned there is but slight correspondence between the easement enjoyed by appellant company in the streets of the city, and the rights of the abutting owners in their several properties. The distinctions between the two are too obvious for discus-

sion. It is enough to say with respect to the former, that it is held and enjoyed subject always to the earlier and superior rights of the public in the streets of the municipality. Among these is the power to regulate and control the streets in the interest of public health and safety. When these demand a change in the mode and manner of the enjoyment of the easement or privilege, and that demand is expressed through the municipal authority, in the exercise of reasonable discretion, that change must be made. *Calling the legislative grant of privilege to use the streets a contract does not avoid the conditions on which the privilege is to be exercised. Whether such limitation or conditions be expressed in the grant or not is immaterial,* for, as said in Butchers' Union Slaughter House Co. v. Crescent City Live Stock Landing Co., 111 U. S. 746, the power to control and regulate the streets so as to protect the public health, is one that cannot be bargained away by legislative or municipal grant. The power to control them for the protection of public safety, if not the same, stands on equally high ground. All authorities agree that such right is both paramount and inalienable. - - - -" (Emphasis supplied)

*City of Louisville, Kentucky* v. *Cumberland Telephone and Telegraph Company,* 224 U. S. 649 (1912). The legislature had given to the utility a charter to maintain its telephone system, erect poles and string wires over the streets and highways of the city, with and by the consent of the city. The court said:

P. 658. "- - - For, while the city was given the authority to consent, the statute did not confer upon it the power to withdraw that consent, and no attempt was made to reserve such a right in the collateral contract contained in those provisions of the ordinance relating to the company's giving a bond and carrying the police and fire wires free of charge - - - -. But the municipality could not by an ordinance impair that contract nor revoke the rights conferred. Those charter franchises

had become fully operative when the city's consent was given, and thereafter the company occupied the streets and conducted its business, not under a license from the city of Louisville, but by virtue of a grant from the State of Kentucky. Such franchises granted by the legislature could not, of course, be repealed, nullified or forfeited by any ordinance of a General Council."

P. 661. "- - - Such a street franchise has been called by various names — an incorporeal hereditament, an interest in land, an easement, a right of way - - - but, howsoever designated, it is property. Detroit v. Detroit Street Ry. 184 U. S. 368, 394; Louisville City Ry. v. Louisville, 71 Kentucky, (8 Bush), 534; West River Bridge v. Dix, 6 How. 507, 534; Board of Morristown v. East Tenn. Tel. Co., 115 Fed. Rep. 304, 307. Being property, it was taxable, alienable and transferable, - - - - -."

P. 663. "- - - - To say that the right to maintain these appliances was only a license, which could be revoked at will, would operate to nullify the charter itself, and thus defeat the State's purpose to secure a telephone system for the public use." (The Court had no occasion to discuss the subject of police power.)

*Old Colony Trust Company* v. *City of Omaha*, 230 U. S. 100 (1913). In 1884 the defendant city gave to a utility permission to maintain its facilities upon and over the public streets. There were conditions exacted. The utility was obliged to allow the police and fire department wires the use of its poles, was not to interfere with public travel and was to remove its facilities from the public streets in 60 days whenever the city by ordinance declared removal to be a necessity. In 1908 the city "elected to terminate" and passed such an ordinance. This was a suit by the trustee for the utility bondholders to enjoin such city action. The injunction was granted. The court said, in part:

P. 117. - - - - "In this aspect, the case is like that in Plattsmouth v. Nebraska Telephone Co., supra,

where the Supreme Court of the State said (p. 466) ; *'That the rights of the defendant in the streets of the city must yield to public necessity - - - is beyond question or dispute;* but, having acquired a right in the streets, and having made expenditures on the strength of the grant extended by the city, the authorities are quite uniform that *this right cannot be taken away in an arbitrary manner and without reasonable cause.'* " (Emphasis supplied)

*Owensboro* v. *Cumberland Telephone Co.,* 230 U. S. 58 (1913). A municipal ordinance granted to the utility telephone system the right to use the city streets for its poles and wires. By a later ordinance the city required the utility to remove its facilities from the streets or else pay a rental which had not been prescribed in the original ordinance. The court held that the later ordinance was unconstitutional under the contract clause of the Federal Constitution.

P. 72. "The power to be a corporation and to conduct a telephone business did not come from the city, nor could it. The only thing which the ordinance pretends to do is to grant an easement in the streets which, as we have already shown, was an unlimited right to place and maintain poles and wires upon the streets, *subject, however, to the police power of the city.* This repealing ordinance, though it purports to be an exercise of the police power in the 'whereas' clause, proceeds immediately to contradict the assertion that the poles and wires are a 'nuisance' by the proviso giving the company an opportunity to purchase the right to continue the use of the streets under conditions 'to be prescribed by ordinance,' upon request of said company. It is a plain attempt to destroy the vested property right under which a great plant had been installed and operated for more than twenty-five years. When that grant was accepted and acted upon by the grantee it became a contract between the city and the telephone company, which could not be revoked or repealed, unless the

power to repeal was clearly and unmistakably reserved. (Emphasis supplied)

The sixth section of the granting ordinance provides that, 'This ordinance may be altered or amended as the necessities of the city may demand.' This is no more than a reservation of the police control of the streets and of the mode and manner of placing and maintaining the poles and wires incident to the unabridgeable police power of the city. See Grand Trunk Railway v. South Bend, 227 U. S. 544. It does not reserve any right to revoke or repeal the ordinance, or to affect the rights therein granted - - - - -"

*New Orleans Public Service, Incorporated* v. *City of New Orleans,* 281 U. S. 682 (1930). The city brought suit to require the street railway corporation without compensation to remove a viaduct and to construct double tracks at street level across railroad tracks. The city asserted that because of an increase in population the single track over the viaduct was indaquate and that the viaduct had not been properly maintained and was dangerous. The defense *inter alia* was that the city ordinance demanding the changes was arbitrary and in violation of the contract and due process clauses of the Federal Constitution. The trial court and supreme court of Louisiana upheld the city's contentions. The United States Supreme Court affirmed the state court decision and in so doing held that the case was distinguishable from the *Owensboro* case, *supra,* which the street railway corporation had cited.

P. 686. "- - - The ordinance now under consideration does not aim to destroy or to exact payment for the right of appellant to use the street for the operation of its street railway. *It purports merely to regulate the use of the streets for the convenience and safety of the public. It does not impair appellant's franchise.*"

P. 687. "- - - *It is elementary that enforcement of uncompensated obedience to a regulation passed*

150

*in the legitimate exertion of the police power is not a taking of property without due process of law. - - - - -"* (Emphasis supplied)

*New York City Tunnel Authority, Appellant* v. *Consolidated Edison Company of New York, Inc., et al., Respondents, et al., Defendants,* 295 N. Y. 467, 68 N. E. (2nd) 445. (1946)

P. 474. "The 'fundamental common-law right applicable to franchises in streets' is that a utility company must relocate its facilities in the public streets when changes are required by public necessities. (Transit Comm. v. Long Island R. R. Co. Bell Ave. case), 253 N. Y. 345, 353.) The rule finds succinct statement in that case (253 N. Y. at p. 351) : *'Although authorized to lay its pipes in the public streets, the company takes the risk of their location and is bound to make such changes as the public convenience and security require, at its own cost and charge.* (Chicago, Burlington & Quincy R. R. Co. v. Chicago,. 166 U. S. 226; New Orleans Gas Light Co. v. Drainage Commission, 197 U. S. 453; Chicago, Burlington & Quincy R. R. Co. v. Drainage Commrs., 200 U. S. 561; Lake Shore & Michigan Southern R. Co. v. Clough, 242 U. S. 375; Chicago, Milwaukee & St. Paul Ry. Co. v. City of Minneapolis, 232 U. S. 430; National Water Works Co. v. City of Kansas, 28 Fed. Rep. 921; Matter of Petition of Deering, 93 N. Y. 361; Chace Trucking Co. v. Richmond, Light & R. R. Co., 225 N. Y. 435). *All these cases are to the point, that these public service corporations maintain their rights in the streets, subject to reasonable regulation and control, and are bound to relocate their structures at their own expense whenever the public health, safety or convenience requires the change to be made.'* " (Emphasis supplied)

P. 475. "If this rule is not to apply here, the distinction must lie in the nature of the project, the character of the authority, or the intent of the Legislature as shown by the enabling statute."

Cases sustaining the foregoing pronouncements are numerous. Charters, franchises, statutory grants and permits affording the use of public ways to utility locations are subservient, expressly or by implication, in the exercise of governmental functions, to public travel and to the paramount police power and relocation of utility facilities in public streets or ways are at utility expense, a common law liability unless abrogated by the clear import of the language used in a particular instance. Some of the authorities are: *Southern Bell Tel., etc. v. State* (Fla.), 75 So. (2nd) 796 (1954); *Southern Bell Tel., etc. v. Commonwealth* (Ky.), 266 S. W. (2nd) 308 (1954); *Natick Gaslight Co. v. Natick,* 175 Mass. 246, 56 N. E. 292 (1900); *Hammond W. & E. C. Ry. v. Zeigler,* 198 Ind. 456, 152 N. E. 806 (1926); *Stillwater Water Co. v. Stillwater,* 50 Minn. 498, 52 N. W. 893 (1892); *Erie Railroad Company v. Board of Public Utility Commissioners,* 254 U. S. 394 (1921); *New Jersey Bell Telephone Co. v. Delaware River Joint Commission,* 125 N. J. L. 235, 15 A. (2nd) 221 (1940); *Consolidated Edison Co. of New York v. State of New York,* 276 App. Div. 677, 97, N. Y. S. (2nd) 431, 302 N. Y. 711, 98 N. E. (2nd) 587 (1950-1); *Raleigh v. Carolina Power & Light Co.,* 180 N. C. 234, 104 S. E. 462 (1920); *Ganz v. Ohio Postal Telegraph Cable Co.,* 140 Fed. 692 (6th Cir., 1905); *County Court v. White,* 79 W. Va., 475, 91 S. E. 350 (1917); *State ex rel., City of Benwood v. Benwood & McMechen Water Co.,* 94 W. Va. 724, 120 S. E. 918 (1923); *Macon v. Southern Bell Tel. & Tel.,* 89 Ga. App. 252, 79 S. E. (2nd) 265 (1953); *Peoples Gas Light & Coke Co. v. Chicago,* 413 Ill. 457, 109 N. E. (2nd) 777 (1953); *Louisville Gas & Electric Co. v. Commissioners of Sewerage of Louisville,* 236 Ky. 376, 33 S. W. (2nd) 344 (1930).

*Southern Bell Tel. & Tel. Co. v. Commonwealth, supra,* concerned a limited-access highway which not only followed existing highways in part but crossed some.

The decisions cited just above regard the considerations of travel and transportation of first concern in the ranking of rights in public ways.

Without express authority from the legislature the state or municipality cannot pay to a utility its expense for relocating an installation in a public street or way. *Anderson* v. *Fuller et al.*, 51 Fla. 380 (1906); *Boston, Worcester & N. Y. Street Ry. Co.* v. *Commonwealth,* 301 Mass. 283 (1938); *Transit Commission* v. *Long Island R. R.,* 253 N. Y. 345, 171 N. E. 565 (1930).

When to accomplish a legitimate, public, protective purpose by a reasonable and not arbitrary regulation, not violative of any constitutional limitation the state invokes the police power obliging utilities to relocate their facilities installed in a public street or way, without compensation, there is no taking of private property but *damnum absque injuria,* damage without the invasion of legal right.

*New Orleans Gas Light Company* v. *Drainage Commission of New Orleans,* 197 U. S. 453 (1905).

> P. 462. "- - - - Chicago, Burlington etc. R. R. Co. v. Chicago, 166 U. S. 226, 254. In the latter case it was held that uncompensated obedience to a regulation enacted for the public safety under the police power of the State was not taking property without due compensation. In our view, that is all there is to the case. The gas company, by its grant from the city, acquired no exclusive right to the location of its pipes in the streets, as chosen by it, under a general grant of authority to use the streets. The city made no contract that the gas company should not be disturbed in the location chosen. In the exercise of the police power of the State, for a purpose highly necessary in the promotion of the public health, it has become necessary to change the location of the pipes of the gas company so as to accommodate them to the new public work. In complying with this requirement

at its own expense none of the property of the gas company has been taken, and the injury sustained is damnum absque injuria."

See, also, *Chicago, Burlington and Quincy Railway Company* v. *People of the State of Illinois ex rel. Drainage Commissioners*, 200 U. S. 561 (1906); *Dakota Central Telephone Co.* v. *Shipman Construction Co.*, 49 S. D. 251, 207 N. W. 72 (1926); *Western Gas Co. of Washington* v. *City of Bremerton*, 153 P. (2nd) 846 (1944).

> P. 847. "The principle of damnum absque injuria is an ancient one. It is applicable here. The city is not guilty of any tort, no wrongful act is being done. The necessity and convenience of the public is being served. No property is taken, no title is disturbed. The authorities are well nigh unanimous that in such a case the city has a paramount right to serve the public necessity and convenience without payment for individual losses resulting therefrom. Many roadside businesses have been destroyed by the rerouting of traffic or changes in the location of streets and highways."

*Boston Electric Light Company* v. *Boston Terminal Company*, 184 Mass. 566, 69 N. E. 346, 348 (1904).

> P. 570. "- - - The Legislature is the supreme authority in regard to public rights in the streets and highways - - - -"

*New Eng. Tel. & Tel. Co.* v. *Boston Terminal Co.*, 182 Mass. 397 (1903) is a case cited with approval in *Portland V. N. E. T. & T. Co.*, 103 Me. 240 *(supra)*. A street was discontinued. Action for damages. Recovery denied.

> P. 399. "These public rights are primarily subject to the regulation and control of the Legislature which represents the public. This regulation and control is usually delegated to the local authorities by general laws, and sometimes by special laws. But the Legislature remains all the time the supreme authority in regard to all public rights

and interests. The authority which it delegates, it may at any time resume, and then it may exercise it as it deems best - - - - -"

*N. B.* P. 398. "- - - - The wires were removed, but *the conduits and manholes were so constructed that they could not be taken up without such destruction as would render them worthless. - - - - -"*
(Emphasis supplied)

See, also, *City of Macon* v. *Southern Bell Tel. & Tel. Co.,* 89 Ga. App. 252, 79 S. E. (2nd) 265 (1953).

The police power cannot be surrendered or contracted away by the state.

*Baxter* v. *Waterville Sewerage District,* 146 Me. 211 (1951).

*New Orleans Gas Light Company* v. *Drainage Commission of New Orleans,* 197 U. S. 453 (1905).

*Northern Pacific Railway Company* v. *State of Minnesota ex rel. The City of Duluth,* 208 U. S. 583 (1908).

*City of Macon* v. *Southern Bell Tel. & Tel. Co.,* 89 Ga. App. 252, 79 S. E. (2nd) 265 (1953).

P. 276. "So it follows that whatever construction could be placed on any contractual franchise right granted by the city to the telephone company, the city could not by contract or otherwise override the police power imposed in it. Neither could the State through Code, § 104-205 do away with its constitutional power to require the plaintiff telephone company to remove its underground conduit from a specific locality to another locality at its own expense, where such removal is necessitated for the safety, protection, welfare, and health of the citizens. Under no construction of the provisions of the Code or of the contract with the city or of any municipal ordinance, can the telephone company acquire a right to use the public highways of the State or the streets which would not

be subordinate to the 'public use and private rights, and subject to any lawful exercise of the police power belonging to the State or to its municipalities or counties.' "

*Boston and Maine Railroad* v. *County Commissioners*, 79 Me. 386 (1887).

P. 393. "This power of the legislature to impose uncompensated duties and even burdens, upon individuals and corporations for the general safety, is fundamental. It is the 'police power.' Its proper exercise is the highest duty of government. The state may in some cases forego the right to taxation, but it can never relieve itself of the duty of providing for the safety of its citizens. This duty, and consequent power, override all statute or contract exemptions. The state cannot free any person or corporation from subjection to this power. All personal as well as property rights must be held subject to the police power of the state. Beer Co. v. Massachusetts, 97 U. S. 25; Stone v. Mississippi, 101 U. S. 814; Butchers' Union Co. v. Crescent City Co., 111 U. S. 746."

The Maine Turnpike Authority is a creation of the legislature.

P. & S. 1941, c. 69; P. & S. 1947, c. 69; P. & S. 1949, c. 41; P. & S. 1951, c. 152; P. & S. 1953, c. 68, c. 91; P. & S. 1955, c. 201.

It is "a body both corporate and politic" and "shall be regarded as performing a governmental function."

The Authority "in order to facilitate vehicular traffic between the southwestern and northeastern section of the state of Maine" "for the benefit of the people of the state of Maine and for the improvement of their commerce and prosperity in which accomplishment the authority will be performing essential governmental functions" was authorized to construct, operate and maintain a turnpike, with the approval of the State Highway Commission, from Kit-

tery to Fort Kent. Such authorization by the legislature was tantamount to "a determination that the public exigency requires such road." *Lynn & Boston Railroad Company v. Boston & Lowell Railroad Corporation,* 114 Mass. 88, 91. It had to be a limited access road from its very design and purpose. Revenue bonds payable solely from tolls were sanctioned, for the cost of construction. Such bonds were not to be a debt of the state of Maine, nor could the faith or credit of the State be at all pledged in their behalf. The turnpike when paid for was to become the property of the State, to be operated thereafter by the State Highway Commission. The Authority was granted power to acquire, hold and dispose of personal property and to acquire "by purchase, continuation, lease or otherwise, real property and rights or easements therein deemed by it necessary or desirable for its purposes and to use such property." Right of eminent domain was accorded as to real property. The Authority was afforded immunity from levy, sale and lien except for the lien granted its bondholders upon its net receipts. Its property, income and the securities it might issue were exempted from all Maine taxes. The turnpike was made available at all times, without charge, to the armed services.

The turnpike was manifestly to be a type of public highway and the Authority was, in its legislative conception, a governmental agency with police power plainly conferred.

> P. L. 1941, c. 69, Sec. 4. Powers. (a)
>
> (4) to construct, maintain, reconstruct and operate a toll turnpike - - - - -
>
> (14) to do all other lawful things necessary and incidental to the foregoing powers.

It is not conceivable that the Authority which was given the responsibility for an expressway essentially direct and straight from Kittery to Fort Kent was subordinated by the legislature to the discretion and action of municipal

officers in the many municipalities to be traversed. Even the State Highway Commission was denied the power or right to be consulted as to the course of the turnpike.

P. L. 1941, c. 69, Sec. 4.   Powers.   (c)

- - - the turnpike and connecting tunnels and bridges, overpasses and underpasses shall be constructed under the supervision of the state highway commission, provided, however, that such supervision of the state highway commission shall not extend to the control of the location or course of the turnpike.

The Authority was empowered to "permit the erection, or installation of electric power, telegraph, telephone, water or pipe line facilities." P. S. 1953, c. 91.

Its real or personal property was not to be devoted to commercial purposes except for gasoline and repair stations and restaurants, for the need of travelers. P. S. 1953, c. 91.

*New York City Tunnel Authority, Appellant* v. *Consolidated Edison Company of New York, Inc. et al., Respondents, et al., Defendants,* 295 N. Y. 467, 68 N. E. (2nd) 445 (1946), is a case with issues very similar to those present here. The Tunnel Authority sought successfully to recover from the utility the cost of relocating utility facilities in the approaches to the tunnel. The court said:

P. 476.  "Nor does the circumstances that tolls are charged in order to finance the improvement change either the character of that improvement or the character of the authority. We may take judicial notice of the fact that, when the authority was created, many municipalities of the State were struggling to finance public improvements which could not be undertaken upon their own direct credit, either because of constitutional debt limitations or because of the disinclination or inability to burden further the traditional taxpayer.

The imposition of a toll or charge for the use of the new improvement does not make the operation a business enterprise carried on for profit, as the Appellate Division suggested. Rather, it creates a new class of taxpayers thought to be more justly charged with the cost of the new improvement. The Legislature's choice of the incidence of this taxation should not, and does not, change applicable principles. Imposing no new burdens on respondents, it was certainly not intended to relieve them of obligations to which they were subject by well-established rules. - - - -"

"The legislature might, of course, have required the authority to pay the expenses of the character here involved — or to reimburse those who laid them out — and respondents contend that the statute so provides. This argument is two-pronged. Respondents argue, first, that the Legislature failed to delegate to the authority expressly its own police power and that in the absence of such a delegation the authority was not intended to be vested with it; and, second, that the power of condemnation given to plaintiff (§ 629) with respect to 'easements,' 'structures,' 'franchises' as well as the power to pay for damages to real estate—carries a fair intendment that the authority was to pay for the charges here in question. It seems to us that neither contention has merit."

P. 477. "The enabling act, it is true, does not contain any delegation of police power in haec verba, but such language is at best rare; it is not contained in any of the statutes governing similar projects, to which our attention has been called. The legislation does, however, contain the language—to which we have already referred—clothing this authority with the attributes of delegated sovereignty as a State agency. Such language would be fully adequate for the purpose even apart from the well settled rule of construction—announced in the *Bell Avenue* case—that the power is to be implied unless expressly negatived." (253 N. Y., at pp. 354-355)

Public ways, as we have noted, *supra,* have, as their proper objects, travel and transportation. Public safety is a prime requisite and transcendentally so in a turnpike. The latter must be of limited access with a minimum of curves and approaches. There can be no intersections. Sufficient overpasses and underpasses must be available. Divided lanes are necessary. Road digging and alteration must be precluded irreducibly. The stream of commerce must flow with all reasonable speed. Millions of automobiles are being made, distributed and placed upon public ways. Old town and shire roads are no longer safe or adequate. Turnpikes or expressways are vital for fast, direct movement of the armed forces and their impedimenta. These are all responsibilities of the police power.

*Highway Research Board, Special Report 21*

> P. 38. "Furthermore, it would be manifestly dangerous to the traveling public to permit telephone or telegraph poles or drains or sewers, even though they were originally constructed in compliance with regulations of the highway authorities or municipalities as to their placement and construction, to remain in those original locations when the highway is widened and those facilities would be situated in the traveled portions of the new mutilated, divided, high speed throughway. Likewise, it would be inconvenient, if not dangerous, to the public for utilities to be permitted to excavate upon the traveled portion of an expressway or throughway when its underground facilities need repairs."

The Authority takes its powers immediately from the legislature and the enabling act delegates police power of considered precedence as to utility facilities located in public streets or ways in its route.

Because of the state of the law authoritatively expressed, without an affirmative grant from the legislature, the defendant utilities when submitting to the police power had no right to reimbursement for relocation of their facilities

installed in the public ways or for abandonment of them. Conversely the Authority had no right to reimburse the utilities without such legislative sanction.

Until the amendment that is P. & S. 1955, c. 201, legislative intendment as to reimbursement is perceived chiefly from the topics, "Definitions" and "Eminent Domain." P. & S. 1941, c. 69.

"Sec. 3.  Definitions.

(b)  The word 'owner' shall include all individuals, copartnerships, associations or corporations having *any title or interest in any property rights, easements, or franchises authorized to be acquired by the act.*

(c)  The words 'the turnpike' shall mean the turnpike to be constructed as hereinafter provided - - - - - and shall be deemed to include not only the turnpike and all tunnels and bridges connected therewith, overpasses and underpasses *but also all property rights, easements and franchises relating thereto and deemed necessary or convenient for the construction or the operation thereof.*

(d)  The term 'cost of the turnpike' shall embrace the cost of constructing the turnpike and all connecting tunnels and bridges, overpasses and underpasses; *the cost of all lands, property rights, easements and franchises* acquired which are deemed necessary for such construction;
- - - - - - - - - -
the construction of the turnpike and connecting tunnels and bridges, overpasses and underpasses;

Sec. 5.  Eminent domain.

(a)  - - - the authority is hereby authorized and empowered to acquire by condemnation any such *real property* whether wholly or partly constructed or *interest or interests therein* and any *lands, rights, easements, franchises* and other property

deemed necessary or convenient for the construction or the efficient operation of the turnpike, its connecting tunnels, or bridges, overpasses or underpasses in the manner hereinafter provided.

(f)   Whenever the authority decides to acquire any *lands, rights, easements* and *franchises* or *interests therein* by condemnation as hereinbefore provided - - - - - the authority shall have the right to immediate possession of the property which is the subject of the condemnation proceedings - - -" (Emphasis supplied)

The enabling act does not in the very words state that the Authority may or must pay the relocation costs in dispute here. Nor does the act imply that those costs may or must be so paid. The description and enumeration of costs and properties fall short of containment of payments for expense arising from damages without the invasion of legal right. The rights of utilities to enjoy installations in public streets or ways are positive and very respectable in the status of the law but they are subordinate to public travel and to the valid exercise of the police power. They have, as we have seen, *supra,* their delimitations. The terms, "real property" "interest or interests therein," "lands," "rights," "easements" and "franchises" as used in the enabling act prior to its last amendment are not sufficiently apt to support the claim of the defendant utilities.

In *New York City Tunnel Authority, Appellant* v. *Consolidated Edison Company of New York, Inc., et al., Respondents, et al., Defendants, supra,* it was held: "that the power of condemnation given - - - with respect to 'easements,' 'structures,' 'franchises'—as well as the power to pay for damages to real estate" did not carry "a fair intendment" that the Authority was to pay for the charges for utility relocations in question.

The defendant utilities still have their franchises which they continue to enjoy although in some instances in new

locations. *New Jersey Bell Telephone Co.* v. *Delaware River Joint Commission,* 125 N. J. L. 235, 15 A. (2nd) 221 (1940) ; *Baltimore Gas and Electric Co.* v. *State Roads Commission of Maryland,* 134 Atl. (2nd) 312, 319 (1957).

We quote from the stipulation of the parties:

> Record of case. "- - - - Wherever the plans called for alteration of a public highway the new highway has been constructed in accordance with such plans and has since been operated and maintained by the respective towns or cities or State Highway Commission."

It is true that some facilities were relocated from public ways to private property. Record of case.

The crossing of public roads by the turnpike in respect to the utilities here has some resemblance to a partial street closing. See *New England Tel. & Tel. Co.* v. *Boston Terminal Co.,* 182 Mass. 397, 400 (1903) ; *City of Macon* v. *Southern Bell Tel. & Tel. Co.,* 89 Ga. App. 252, 79 S. E. (2nd) 265 (1953). Or to the elimination of a grade crossing. See *Transit Commission* v. *Long Island R. R.,* 253 N. Y. 345, 171 N. E. 565 (1930). *Philadelphia Suburban Water Co.* v. *Pennsylvania P. U. C.,* 168 Pa. Super. 360, 78 A. (2nd) 46 (1951).

> P. 51. "Whether regarded as an exercise of the police power or of the power of eminent domain, the vacation of a highway is not a taking of private property for public use, requiring payment of compensation conformably to the Constitution, Art. 1, Sec. 10. Paul v. Carver, 24 Pa. 207. Unless a statute expressly imposes liability for compensation upon the commonwealth for the vacation of a highway, neither damages nor compensation are recoverable."

By P. & S. 1955, c. 201, the legislature amended § 5, sub-§ (d) and sub-§ (e), "Eminent Domain," of the enabling act to permit the Authority to acquire real or personal property

or rights therein, of a utility for the authorized purposes of the Authority and to condemn utility facilities legally located in a public street or way by franchise, permit or legislative authority, by paying value or relocating costs of facilities, whichever is the lesser.

The amendment became effective August 20, 1955 and yet contained this language:

"- - - - - Said payment shall include payment of such cost for any such property or facilities acquired or the cost of any such relocations made at the request of and for the benefit of said authority in any section of the turnpike under construction and not open to public use prior to May 1, 1955, except where said authority has obtained title thereto by purchase or specific conveyance."

The amendment thus purported to be partially retroactive.

The Augusta extension of the turnpike was not open to public use before May 1, 1955 but was under construction and "largely completed."

The authority had not been obligated to pay the relocation costs of the defendant utilities prior to the enactment of the 1955 amendment to the enabling act. It remains to be determined if that amendment could be retroactive, to affect the trustees or bondholders of the Authority or the turnpike funds.

We quote from the stipulation of the parties in this case:

"19—To finance the construction, maintenance and operation of the aforesaid Augusta Extension, the Maine Turnpike Authority pursuant to its Resolution dated April 23, 1953, executed and delivered to the Trustees a Trust Indenture dated as of January 1, 1953, but actually executed and delivered on or about May 15, 1953, a copy of which marked 'Exhibit A' is annexed to the plaintiffs' bill of complaint. The provisions thereof were for-

mally approved by the Maine State Highway Commission by vote dated April 23, 1953. In addition to the initial issue of $75,000,000 Refunding and Revenue Bonds, the Authority in May 1956 issued under and pursuant to the provisions of said Trust Indenture Refunding and Revenue Bonds in the amount of $3,600,000 to meet costs incurred in connection with the construction of the Augusta Extension.

20—To promote the sale of the aforesaid first issue of $75,000,000 of Refunding and Extension Bonds and as an inducement thereto there was issued and circulated to the public a Prospectus, a copy of which marked 'Exhibit B' is annexed to the plaintiffs' bill of complaint. The said Prospectus was approved by a Resolution of the Authority dated April 23, 1953. All of said first issue of bonds in the form set forth in the said Trust Indenture was duly issued and sold prior to August 20, 1955.

21—The complainants herein and those who purchased and now hold the first issue of Refunding and Extension Bonds acted in reliance upon the estimates and representations contained in the Prospectus and the Trust Indenture.

24—After the issue and sale of the $75,000,000 of Refunding and Extension Bonds aforesaid, and after a large part of the work of relocating the facilities above referred to had been performed, there was enacted and became effective August 20, 1955, an amendment to Section 5 sub-section (d) and (e) of the aforesaid Chapter 69 of the Private and Special Acts of Maine of 1941; the amendment being Chapter 201 of the Private and Special Acts of Maine of 1955."

The authority did not invoke condemnation at any time as to the utility facilities or purchase them. It has no obligations based upon actual condemnation.

*New Jersey Bell Tel. Co.* v. *Delaware River Joint Commission,* 125 N. J. L. 235, 15 A. (2nd) 221 (1940).

In re *Delaware River Joint Commission*, 342 Pa. 119, 19 A. (2nd) 278 (1941).

The legislature possessed the power and authority to alter, amend or repeal the enabling act at any time following the enactment thereof. R. S. 1930, c. 56, § 2; R. S. 1944, c. 49, § 2; R. S. 1954, c. 53, § 2. But in the exercise of that prerogative the legislature had no right to impair the obligation of a contract amongst the Authority and others.

> "No state shall - - - - pass any - - - - law impairing the obligation of contracts - - - -." *Constitution of the United States,* Article I, § 10.

> "The legislature shall pass no bill of attainder, ex post facto law, nor law impairing the obligation of contracts, - - - - -." *Constitution of Maine,* Article I, § 11.

The enabling act, prior to 1953, granted to the Authority leave to provide from time to time for the issuance of bonds to pay the "cost" of the turnpike, to pledge all or any of the turnpike revenue to secure payment of the bonds, to set aside reserve and sinking funds and to regulate and dispose thereof, to covenant against pledging any turnpike revenue and to covenant as to the bonds to be issued, as to their issue in escrow or otherwise and as to the use and disposition of the proceeds. P. & S. 1941, c. 69, § 6.

The enabling act, prior to 1953, required the Authority to apply the proceeds of all bonds solely to payment of the "cost" of the turnpike and to the appurtenant fund and created and granted a lien on such moneys until so applied, to the bondholders and the trustees. P. & S. 1941, c. 69, § 7. The Authority was permitted to execute an indenture with a trustee, to thus pledge or assign tolls or revenues and to define and protect the rights and remedies of bondholders and trustees. P. & S. 1941, c. 69, § 8.

The Bond Indenture made in 1953 pursuant to the enabling act restricted the funds of the Authority to be used only for the "cost" of the Augusta Extension of the turnpike, the cost of maintenance, repair and operation of the turnpike and for interest and redemption to the bondholders. No provision was made for paying any relocation expenses to utilities.

The legislature in the enabling act had been at considerable pains to immunize the State of Maine from liability for the turnpike and to make it unmistakably clear that the State's credit was in no way pledged therefor. To compensate for those negations the State afforded considerable security to bondholders to assure a favorable marketability for the bonds. Hence the provisions as to exemption from taxation, attachment, execution and the imposition of the lien upon the proceeds of the bonds and turnpike revenue, etc. The indenture, in 1953, was adapted to the act. The enabling act and indenture were the basis of the bondholders' and trustees' contract with the Authority, a governmental agency.

The Bond Indenture of 1953 contained the following:

P. 2. "Whereas, for the purpose of providing funds for paying the cost of the Initial Unit, the Authority duly issued its turnpike revenue bonds in the aggregate principal amount of Twenty Million Six Hundred Thousand Dollars ($20,600,000), - - - -

P. 3. "Whereas, by virtue (of the enabling act), the Authority is authorized and empowered to provide for the issuance of turnpike revenue bonds of the Authority for the purpose of refunding the outstanding bonds and paying the cost of any additional integral operating unit or units and the cost of improvements, extensions and enlargements; and

P. 3. "Whereas, the Authority had determined to proceed at this time with the construction of the second integral operating unit of the turnpike - - - -

P. 4. "Whereas, the Authority has caused an estimate to be made by its Consulting Engineers of the *cost* of constructing the Augusta Extension at such location and, according to such estimate, the proceeds of the bonds to be issued initially under the provisions of this Indenture will be required and will be sufficient for paying the *cost* of the Augusta Extension and for refunding the outstanding bonds, other funds being available in the Interest and Sinking Fund (a special fund created under the provisions of the trust indenture securing the outstanding bonds), including the Reserve Interest Account therein, in an amount sufficient to provide for paying the interest which will accrue on the outstanding bonds to the date of their redemption and the redemption premium thereon; and

P. 4. "Whereas, the Authority has determined to provide for the issuance at this time of turnpike revenue bonds of the Authority for the purpose of refunding the outstanding bonds and paying the *cost* of the Augusta Extension, as above set forth, and to provide for the issuance at a later date under the provisions of this Indenture of turnpike revenue bonds of the Authority for the purpose of paying the cost of additional integral operating units - - - -

P. 4. "Whereas, for the purpose of refunding the outstanding bonds and paying the *cost* of the Augusta Extension, as above set forth, the Authority has by resolution duly authorized the issuance of turnpike revenue bonds of the Authority in the aggregate principal amount of Seventy-five Million Dollars ($75,000,000), designated 'Turnpike Revenue Refunding and Extension Bonds,' - - - -

P. 26. "Section 208. There shall be initially issued under and secured by this Indenture turnpike revenue bonds of the Authority in the principal

amount of Seventy-five Million Dollars ($75,000,-000) for the purpose of refunding the outstanding bonds and paying the *cost* of the Augusta Extension - - - -

P. 29. "Section 209. If and to the extent necessary (as shown by the documents mentioned in clauses (a) and (c) of this Section) to provide additional funds for completing payment of the *cost* of the Augusta Extension, turnpike revenue bonds may be issued under and secured by this Indenture, at one time or from time to time, in addition to the bonds issued under the provisions of Section 208 of this Article - - - -

(a) a copy, certified by the Secretary and Treasurer of the Authority, of the resolution adopted by the Authority authorizing the issuance of such additional bonds in the amount specified therein;

- - - - - - - - - - - - - - -

(c) a statement, signed by the Consulting Engineers, giving their estimate of the date on which the Augusta Extension will be opened for traffic and the date on which the construction of the Augusta Extension will be completed and certifying that, according to their estimate of the total amount required for paying *the balance of the cost* of the Augusta Extension, the proceeds of such bonds will be required for paying such *balance*;" (Emphasis supplied)

The Bond Indenture of 1953, Section 403, in defining the "cost" of the Augusta Extension, stated:

"- - - - without intending thereby to limit or restrict or to extend any proper definition of such *cost* under the provisions of the Enabling Act, - - - -" (Emphasis supplied)

The bonds issued and sold prior to August 20, 1955, under the indenture contained this paragraph:

"This bond is issued and the Indenture was made and entered into under and pursuant to the Constitution and laws of the State of Maine, including

the Enabling Act, and under and pursuant to resolutions duly adopted by the Authority. The Indenture, in accordance with and as required by the Enabling Act, provides for the fixing and charging by the Authority of tolls for the use of the Turnpike and the different parts or sections thereof and for adjusting such tolls from time to time in order that such tolls and other revenues of the Turnpike will be sufficient to provide funds to pay the cost of maintaining, repairing and operating the Turnpike and to pay the principal of and the interest on all bonds issued under the Indenture as the same become due and payable, and to create reserves for such purposes. The Indenture also provides for the deposit of all such tolls and other revenues, over and above such cost of maintenance, repair and operation and reserves for such purposes, to the credit of a special fund, designated the 'Maine Turnpike Interest and Sinking Fund,' which fund is pledged to and charged with the payment of the principal of and the interest on all bonds issued under the Indenture."

The 1955 amendment to the enabling act was intended to ordain the payment by the Authority of the utilities' relocation costs. Such payment could be made only by diversion from moneys which pursuant to the enabling act and the indenture thereunder had been in 1953 pledged with the plaintiff trustees for the turnpike bondholders. The 1955 amendment in so far as it pretended to prescribe such a payment was unconstitutional. It sought to impair a contract made for a valuable consideration by a State agency upon "the deliberate action and solemnly pledged faith of the Commonwealth."

*Opinion of the Justices,* 190 Mass. 605 (1906).

*Rorick* v. *Board of Com'rs of Everglades Drainage Dist.,* 57 F. (2nd) 1048 (Fla.) (1932).

P. 1055. "Legislation by authority of which bonds are issued, and their payment provided for

becomes a constituent part of the contract with the bondholders. Such a contract is within the protection of the Constitution, Art. I, § 10 - - - -"

*Beaver County Building and Loan Association, Appellant, v. Winowich et ux.,* 323 Pa. 483 (1936).

P. 489. "In determining what constitutes the obligation of a contract, no principle is more firmly established than that the laws which were in force at the time and place of the making of the contract enter into its obligation with the same effect as if expressly incorporated in its terms."
- - - -

P. 492. "Any law which enlarges, abridges, or in any manner changes the intention of the parties as evidenced by their contract, imposing conditions not expressed therein or dispensing with the performance of those which are a part of it, impairs its obligation, whether the law affects the validity, construction, duration, or enforcement of the contract; Story's Commentaries on the Constitution, Book 3, ch. 34, sec. 1379."

*Martin et al. v. Saye et al.,* 147 S. C. 433, 145 S. E. 186 (1928).

*City of Little Rock et al. v. Community Chest of Greater Little Rock,* 163 S. W. (2nd) 522 (1942).

*Forbes Pioneer Boat Line v. Board of Commissioners of Everglades Drainage District,* 258 U. S. 338 (1922).

*Pennsylvania Coal Company v. Mahon et al.,* 260 U. S. 393 (1922).

*Coombs v. Getz,* 285 U. S. 434 (1932).

*Woodward v. Central Vermont Railway Company,* 180 Mass. 599 (1902).

*Fletcher v. Peck,* 6 Cranch, 87 (1810).

*St. Louis Union Trust Co., et al. v. Franklin American Trust Co.,* 52 F. (2nd) 431 (1931).

*Hawthorne* v. *Calef,* 2 Wallace 10 (1864).

*Woodruff* v. *Trapnall,* 10 Howard 190 (1850).

*Curran* v. *State of Arkansas,* 15 Howard 304 (1853).

*Von Hoffman* v. *City of Quincy,* 4 Wallace 535 (1866).

> "The amount of impairment of the substantive obligation of a contract is immaterial. Any deviation from its terms, however slight, falls within the meaning of the constitution: Greene v. Biddle, 8 Wheat. 1, 84; Ogden v. Saunders, 12 Wheat. 213, 256; Walker v. Whitehead, 16 Wall. 314, 318."

*Beaver County Building and Loan Association, Appellant* v. *Winowich et ux., supra,* P. 493; see, also, *Martin et al.* v. *Saye et al., supra,* at Page 447.

In the instant case the cost of relocating the utility facilities is not computed but the stipulation of the parties that the total amount "does not and shall not exceed $300,000" is some basis of inference that the amount is very ponderable and quite conclusive.

We are not unaware that all acts of the legislature are presumed to be constitutional and will not be adjudged to be otherwise unless the conclusion is free from all doubt.

*State* v. *Pooler,* 105 Me. 224, 228 (1909).

*In re John M. Stanley, Exceptant,* 133 Me. 91 (1934).

*Baxter* v. *Waterville Sewerage District,* 146 Me. 211 (1951).

*Laughlin* v. *City of Portland,* 111 Me. 486 (1914).

*Village Corporation* v. *Libby,* 126 Me. 537 (1928).

*Warren* v. *Norwood,* 138 Me. 180 (1941).

*Kelley* v. *School District et al.,* 134 Me. 414 (1936).

*Hamilton* v. *District,* 120 Me. 15 (1921).

We are convinced that we have resolved "every reasonable doubt in favor of the proposition that" the 1955 amendment to the enabling act "is within and under the terms of the constitution." (*Baxter* v. *Waterville Sewerage District, supra.*)

In our deliberated judgment the amendment of 1955 in so far as it purports retroactively or prospectively to affect the bonds issued pursuant to the Indenture for the "cost" of the Augusta Extension, by providing payment from the funds of the turnpike for utility relocation in the Augusta Extension is a nullity.

As to the trustees, bondholders and turnpike funds the 1955 amendment to the enabling act is unconstitutional, as well, in its professed effect retroactively and prospectively, of providing payment for utility relocation costs of the Augusta Extension since it is thus violative of the Fourteenth Amendment to the United States Constitution.

"- - - - - It would transfer a vested property right from one person to another by the pure fiat of the Legislature. - - - - -"

*Hanscom* v. *Malden & Melrose Gas Light Co.*, 220 Mass. 1, 7 (1914).

See, also, *Opinion of the Justices*, 134 N. E. (2nd) 923, 926 (Mass.) (1956) and authorities cited.

*Ettor* v. *City of Tacoma*, 228 U. S. 148 (1913).

> *Case remanded to the Supreme Court in Equity for the entry of a declaratory judgment decree in accordance with this opinion.*